# IDAHO SHEET METAL WORKS, INC. *v*. WIRTZ, SECRETARY OF LABOR.

No. 30.  Argued December 8, 1965.—Decided February 24, 1966.*

---

*Together with No. 31, *Wirtz, Secretary of Labor* v. *Steepleton General Tire Co., Inc., et al.,* on certiorari to the United States Court of Appeals for the Sixth Circuit.

*Eli A. Weston* argued the cause for petitioner in No. 30. On the brief was *T. H. Eberle*.

*Bessie Margolin* argued the cause for petitioner in No. 31. With her on the briefs were *Solicitor General Marshall, Ralph S. Spritzer, Philip B. Heymann, Charles Donahue* and *Caruthers G. Berger.*

*Charles Donahue* argued the cause for respondent in No. 30. With him on the brief were *Solicitor General Marshall, Philip B. Heymann, Bessie Margolin, Robert E. Nagle* and *Caruthers G. Berger.*

*Lucius E. Burch, Jr.,* argued the cause for respondents in No. 31. With him on the brief was *Tom Mitchell, Jr.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

The common question presented by these two cases is the meaning of the phrase "retail or service establishment" as that language is used in the exemptive provisions of the federal wage and hour statute. We first set forth the statute and describe the two cases before us, then examine the history and content of the exempting clause, and finally apply the resulting analysis to the facts of each case.

I.

The Fair Labor Standards Act of 1938 enacted a comprehensive scheme providing for minimum wages and overtime pay for workers "engaged in" or "in the production of goods for" interstate and foreign commerce.[1] Among other exemptions, Congress by § 13 (a)(2) of the Act has excluded from the statute's wage and hour protections those employees working for certain "retail

---

[1] 52 Stat. 1060, as amended, 29 U. S. C. §§ 201–219 (1964 ed.). Sections 6–7, codified as §§ 206–207, respectively cover minimum wages and overtime pay. The commerce coverage of the Act, through a special definition of "production," is drawn in generous terms. See § 3 (j), codified as § 203 (j).

or service" establishments.[2]  To qualify for this exemption in its present form, an establishment must meet three tests: *first,* it must make more than 50% of its annual dollar volume of sales of goods or services within the State;[3] *second,* it must meet one of four tests designated "(i)–(iv)," chiefly designed to prevent most very large employers from enjoying the exemption;[4] *third,* it must be a "retail or service establishment."  Regarding this third requirement—which is the focus of this decision—§ 13 (a)(2) states that "[a] 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services

---

[2] 52 Stat. 1067, as amended, 29 U. S. C. § 213 (a)(2) (1964 ed.). The section provides that the minimum wage and overtime pay provisions of the Act shall not apply to:

"(2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, if such establishment—

". . . [meets one of four tests, designated '(i)–(iv)' and framed with reference to another section of the Act].

"A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry."

[3] This requirement has been met by the companies in this case. Section 13 (a)(4) of the Act, added in 1949 by 63 Stat. 917, 29 U. S. C. § 213 (a)(4) (1964 ed.), provides that an establishment that makes or processes the goods it sells may qualify as exempt if it meets the tests of § 13 (a)(2) and "is recognized as a retail establishment in the particular industry" and makes more than 85% of its annual dollar volume of sales of such goods within the State. So far as the companies in this case may be deemed to make or process the goods they sell, the Government is apparently satisfied that the added requirements of § 13 (a)(4) have been met or at least is unwilling to rely upon them.

[4] These four tests were added to § 13 (a)(2) in 1961 by 75 Stat. 71.  The Government has not suggested that this amendment would disqualify either of the companies in the present case.

(or of both) is not for resale and is recognized as retail sales or services in the particular industry."

Of the cases before us, the first one, No. 30, stems from two consolidated actions brought by the Secretary of Labor against Idaho Sheet Metal Works, Inc. (Idaho Sheet). By one action the Secretary sought to enjoin future disregard of the Act's overtime provisions, and by the other he sought to collect on behalf of one employee unpaid overtime compensation for a period during the year 1960. See §§ 15–17, 52 Stat. 1068–1069, as amended, 29 U. S. C. §§ 215–217 (1964 ed.). The ensuing litigation established that Idaho Sheet operates a plant in Burley, Idaho, where it employs about 12 workers to fabricate, install, and maintain sheet metal products. Many articles are sold to individuals, farmers, and local merchants, the plant has display racks to show its wares, and about 60% of sales in number are said to be to "the general public" as opposed to industrial customers. About 83% of the gross income, however, is derived from metal work done on equipment used by five potato processing companies which dehydrate and freeze the potatoes for interstate shipment.

For its defense, Idaho Sheet denied its workers were engaged in or producing goods for interstate commerce. It also claimed to be an exempt retail or service establishment, adducing proof that over 75% of its dollar volume of sales was not for resale and that its officials and salesmen who sell to it regarded the business as retail. The District Court held that Idaho Sheet was outside the interstate commerce coverage of the Act and was in any case exempt. The Court of Appeals for the Ninth Circuit reversed on both points and held in favor of the Secretary. 335 F. 2d 952. We granted certiorari limited to the question whether Idaho Sheet was a retail or service establishment within the meaning of the Act. 380 U. S. 905.

In the other case before us, No. 31, the Secretary of Labor sued the Steepleton General Tire Company (Steepleton) and its president to require compliance with the minimum wage, overtime pay, and record-keeping provisions of the Act. Steepleton, which is located in Memphis, Tennessee, and employs about 47 workers, is a franchised tire dealer engaged in the sale, recapping, and repair of tires. Some of Steepleton's income derives from dealings with private customers but more than half the gross income comes from sales and repairs of tires furnished to businesses operating heavy industrial or construction vehicles or operating fleets of trucks; apparently a sizable though unspecified portion of these commercial customers operated their equipment in interstate commerce.

The District Court determined that Steepleton came within the interstate commerce coverage of the Act, and that issue is no longer in the case. Alleging itself to be exempt under § 13 (a)(2), Steepleton showed that 75% or more of its sales were not for resale and that the industry's predominant and long-standing use of the word retail applied that term to all tire sales not for resale, despite the commercial character of the tires and the established pattern of quantity discounts. The only explanation offered for this use was that it conformed to many state sales tax statutes. The Secretary showed that the industry sometimes used the word retail in other senses that excluded commercial sales and that commercial customers of Steepleton did not regard their purchases as retail transactions. The District Court held Steepleton to be entitled to the exemption. The Court of Appeals for the Sixth Circuit affirmed the District Court in all respects, 330 F. 2d 804, and we granted certiorari at the behest of the Secretary to consider whether Steepleton qualified as a retail or service establishment. 380 U. S. 904.

The approach of the Sixth Circuit, which took industry usage as controlling, and that of the Ninth Circuit, which rejected it as the sole test, represent irreconcilable interpretations of the critical statutory language. While support can be mustered for both views, we believe the Ninth Circuit is correct and on this point follow our earlier decision in *Mitchell* v. *Kentucky Finance Co.,* 359 U. S. 290. After rejecting the industry's usage as controlling, we face the further difficult question of what criteria do determine when business transactions are retail under the Act; to this question it is still less easy to return a clear-cut answer, but our analysis of the matter leads us to conclude that neither Idaho Sheet nor Steepleton qualifies as a retail or service establishment.

## II.

To construe the present language of the exemption demands a knowledge of its origins. Section 13 (a)(2), as it appeared in the 1938 enactment, used the present phrase "retail or service establishment" to delimit the exemption but did not further define the concept.[5] The Department of Labor's Wage and Hour Administrator initially made his interpretation of the retail exemption known through an Interpretative Bulletin and through various official statements.[6] To summarize very generally, the Administrator viewed a retail establishment as one selling goods or services to private individuals for personal or family consumption; sales of these same

---

[5] The 1938 version read: "(a) The provisions of sections 6 and 7 shall not apply with respect to . . . (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce." 52 Stat. 1067.

[6] This Bulletin, designated No. 6, appears along with other official statements in various editions of the BNA Wage and Hour Manual (hereafter cited as WH Manual), *e. g.,* 1942 edition. The Secretary's present views are stated in 29 CFR §§ 779–779.515 (1965).

goods or services to businesses or state agencies remained retail if sold at the normal price charged private consumers or in quantities a private consumer would buy. See Interp. Bull. No. 6, ¶ 14, in 1942 WH Manual, p. 330. However, there were deviations from this consumer-goods standard in favor of employers, notable instances being the exemption of farm implement dealers and linen supply firms supplying commercial customers. See Statements of the Administrator, in 1944–1945 WH Manual, pp. 469–470.

In 1946 this Court decided *Roland Co.* v. *Walling,* 326 U. S. 657, holding *inter alia* that a business engaged in commercial wiring, electrical contracting for industry, and repair and replacement of electric motors and generators did not constitute a retail or service establishment. The opinion used considerable language suggesting that no sale of any article for business or profit-making use as opposed to personal consumption could qualify as a retail sale, a position which supported the result but went far beyond a necessary holding. See 326 U. S., at 673–677. This case, and several others in this vein,[7] prompted the Administrator to report to Congress that certain hitherto exempt classes of business were endangered—notably farm equipment dealers—and to recommend amending legislation. See 1948 Wage and Hour Division, Annual Report, pp. 120–121.

The Administrator proposed, so far as immediately relevant, to define a retail establishment as one deriving 75% of its income from retail sales and then to define as retail sales those made to private individuals for personal or family consumption, sales of the same items to any other customer if not for resale and if similar in type

---

[7] See *Martino* v. *Michigan Window Cleaning Co.,* 327 U. S. 173; *Boutell* v. *Walling,* 327 U. S. 463. See also *McComb* v. *Factory Stores Co.,* 81 F. Supp. 403; *McComb* v. *Diebert,* 16 CCH Labor Cas. ¶ 64,982.

and quantity, and sales to farmers of goods of the type and quantity used on the ordinary farm. When Congress convened in 1949, a number of bills were introduced to amend the Act in various respects. The bill reported out by the House committee and the substitute measure first debated by the House adopted the Administrator's basic proposal, but a further substitute backed by an opposing coalition and introduced as an amendment during the debates finally prevailed and was sent to the Senate.[8] This bill as passed contained the definition of exempt retail and service establishments that became law in 1949 and which remains the law today.[9] The Senate during the debate of its own committee-reported bill, which did not amend the retail exemption, amended the Senate bill to conform to the House's revision of § 13 (a)(2).[10] Thus, when the House-Senate conference committee met to iron out other differences in the respective versions of the legislation, uniformity in the amendment to § 13 (a)(2) already existed. The debates on the retail exemption in each House were substantial and several legislative documents construe the amended section.[11]

---

[8] The bill reported out of committee was H. R. 3190, 81st Cong., 1st Sess., accompanied by H. R. Rep. No. 267. The first substitute was H. R. 5856, brought to debate by H. Res. 183. The final, successful version retained the number H. R. 5856 but was drawn from H. R. 5894. See generally 6 Lab. Rel. Rep., p. 90:459 (1961).

[9] The only difference between the 1949 version of § 13 (a)(2) and current law derives from the 1961 amendment to the section, which is not relevant in this case. See n. 4, *supra*, and accompanying text.

[10] The bill reported out of committee was S. 653, 81st Cong., 1st Sess., accompanied by S. Rep. No. 640. The amendment was offered at 95 Cong. Rec. 12491 and passed at 95 Cong. Rec. 12520.

[11] The principal debates appear at various points in 95 Cong. Rec. 11002–11203 (House), 12490–12520 (Senate). No initial committee reports discuss the ultimately successful version of § 13 (a)(2) but a pertinent statement of the House members of the conference

In light of the legislative history, the first question to be faced is whether the 1949 amendment requires the Secretary to treat as retail any sale of goods or services not for resale that is most customarily described or labeled as a retail transaction by those in the industry, acting of course in good faith. If the answer were yes, then both Idaho Sheet and Steepleton would deserve exemptions without more ado, since admittedly the predominant or sole usage of those in the industry applied the term retail to the questioned sales. It should not be said that this reading is without support. Most importantly, it would appear to follow from the most literal reading of the statute; the phrase "recognized as retail . . . in the particular industry" well lends itself to an inquiry into how the businessmen concerned term their dealings. Some statements in the debates explicitly foster this reading, for example, the comment by Senator Holland who sponsored the amendment in the Senate that under his approach, "for different commodities . . . we have to find the definition which is understood by the people dealing in that industry." 95 Cong. Rec. 12519.[12] We do not agree with the Government that this reading is necessarily infirm because the Secretary and courts may have to seek a standard or predominant use of the word retail among several uses extant in the industry. Certainly we do not agree with the further suggestion that this literal reading must give the industry self-determination as to whether the exemp-

---

committee appears in H. R. Conf. Rep. No. 1453, 81st Cong., 1st Sess., pp. 24–26 (hereafter cited as House Conf. Rep.). There is also a relevant but less authoritative statement of the majority of Senate conferees (hereafter cited as Senate Conf. Majority Statement) appearing at 95 Cong. Rec. 14877.

[12] Other comments in some measure favoring the most literal construction are those assuming that each industry has an established understanding of what is a retail sale, e. g., 95 Cong. Rec. 12502 (remarks of Senator Holland), 12516 (remarks of Senator

tion applies; courts are not incompetent to distinguish between a legitimized usage fixed by established practice and one recently instituted with the aim of avoiding the law.

On balance, however, the arguments against this literal reading are more persuasive. At the start, such a reading would attribute to Congress a purpose going well beyond its reiterated explanation that the amendment was designed to overturn the sweeping principle of the *Roland* case. The legislative history is replete with evidence that the target of the amendment was *Roland*'s proposition that no sale to a business purchaser could be a retail sale, which Senator Holland condemned by comparing the different status it gave to the sale of a batch of towels to a housewife and the same sale to a hotelkeeper. 95 Cong. Rec. 12494.[13] Further, for every suggestion in the debates that Congress intended also wholly to revamp the exemption by substituting an overriding industry-usage test, there are statements that point in the other direction. Thus, Senator Holland observed that his amendment would not undo the commonly held view that quantity sales at discount prices are generally nonretail.[14] It was said that the "recog-

Taft); those few which seem to equate "recognized as retail" with "regarded as retail," 95 Cong. Rec. 11003 (remarks of Mr. Lucas, sponsor of the prevailing version in the House), 12502 (remarks of Senator Holland); and one or two suggesting that a discount sale may qualify as retail, 95 Cong. Rec. 11003 (remarks of Mr. Lucas), 11199 (remarks of Mr. McConnell).

[13] See House Conf. Rep., p. 24 ("This clarification [the amended § 13 (a)(2)] is needed in order to obviate the sweeping ruling of the Administrator and the courts that no sale of goods or services for business use is retail. See *Roland Electrical Co.* v. *Walling* . . . ."); 95 Cong. Rec. 11003 (remarks of Mr. Lucas); 95 Cong. Rec. 11203 (remarks of Mr. Celler).

[14] "Of course if . . . [a sale is 'made in such quantity that discounts are allowed'] it comes in the category of wholesale sales."

nizing" is done by the Administrator and the courts as well as the merchant, 95 Cong. Rec. 12510 (remarks of Senator Holland), and that due weight must be given to the "actual practice" in the industry, Senate Conf. Majority Statement, 95 Cong. Rec. 14877, and the "well-settled habits of business," 95 Cong. Rec. 12510 (remarks of Senator Holland). The lists set forth of potentially retail businesses include almost only those selling consumer goods and services. See House Conf. Rep., p. 25 (quoted p. 203, *infra*); 95 Cong. Rec. 11003–11004 (remarks of Mr. Lucas); 95 Cong. Rec. 12502 (remarks of Senator Holland). There are denials that the industries' own interpretations of a retail sale will be decisive.[15]

The conclusive consideration for us in rejecting the industry-usage test is that it would compel results flatly inconsistent with those Congress explicitly contemplated and might indeed work a major revolution in the Act's coverage not acknowledged in any legislative statement or report before us. The prime example of this threatened inconsistency is the problem presented to this Court in 1959 by *Mitchell* v. *Kentucky Finance Co.*, 359 U. S.

---

95 Cong. Rec. 12501. Perhaps more ambiguously, Senator Holland also stated: "If sales were made in sufficient quantity so there would be a discount and they would be regarded not as retail sales, but as wholesale sales, they would lose their exemption." 95 Cong. Rec. 12497. See also 95 Cong. Rec. 12505. But cf. 95 Cong. Rec. 11003 (remarks of Mr. Lucas).

[15] "Mr. DOUGLAS. I understand that the interpretation which would be made would be that given to 'retail sale' by a trade association.

"Mr. HOLLAND. That is one criterion, of course; but I do not believe the Senator from Illinois, and certainly not the Senator from Florida, would wish to delegate full authority in the matter to a trade association or any other interested group." 95 Cong. Rec. 12501.

See also 95 Cong. Rec. 12510 (remarks of Senator Holland).

290, where a business making small personal loans and purchasing conditional sale contracts from retailers claimed to be an exempt retail or service establishment. Although the company introduced persuasive evidence that the industry regarded its transactions as retail, the Court denied the exemption in the face of the legislative history indicating a limited purpose for the 1949 amendment and containing an express statement that "[t]he amendment does not exempt banks, insurance companies, building and loan associations, credit companies, newspapers, telephone companies, gas and electric utility companies, telegraph companies, etc., because there is no concept of retail selling or servicing in these industries." House Conf. Rep., pp. 25–26. See Senate Conf. Majority Statement, 95 Cong. Rec. 14877. If weight is to be given to statements about the nonretail status of quantity sales at discounts, see n. 14, *supra,* congressional intent would be similarly frustrated by the truck tire industry's retail designation of all sales not for resale no matter how great the quantity and discount. In view of the use of the word retail in the truck tire and credit industries, it would hardly be surprising to find that newspaper, telephone, or gas and electric companies label their sales to consumers as retail. Yet the legislative history is so explicitly opposed to the extension of the retail exemption to such businesses as to provide the final argument against adopting an industry-usage test that could dictate that result.

Since we reject the industry's usage as the single touchstone, the question arises what meaning is to be given to the term retail. In approaching this question we agree with the Secretary that it is generally helpful to ask first whether the sale of a particular type of goods or services can ever qualify as retail whatever the terms of sale; if and only if the answer is affirmative is it then

necessary to determine the terms or circumstances that make a sale of those goods or services a retail sale.

Plainly the typical retail transaction is one involving goods or services that are frequently acquired for family or personal use. As examples of sales that could qualify as retail, the House Conference Report lists those made "by the grocery store, the hardware store, the coal dealer, the automobile dealer selling passenger cars or trucks, the clothing store, the dry goods store, the department store, the paint store, the furniture store, the drug store, the shoe store, the stationer, the lumber dealer, etc. . . ." House Conf. Rep., p. 25 (sale of farm machinery is another example given). See also 95 Cong. Rec. 11003–11004 (remarks of Mr. Lucas); 95 Cong. Rec. 12502 (remarks of Senator Holland). Of course Congress' conceded intent to overrule the *Roland* principle means sales of such goods or services can be retail "whether made to private householders or to business users," House Conf. Rep., p. 25, but the goods and services listed nearly all share the common characteristic that they are often purchased by householders. The legislative recital of telephone, gas and electric, and credit companies along with a number of others as businesses outside the exemption, see p. 202, *supra,* demonstrates that not everything the consumer purchases can be a retail sale of goods or services, but the breadth of this qualification need not here be explored.

What is important for this decision is that Congress also intended that the retail exemption extend in some measure beyond consumer goods and services to embrace certain products almost never purchased for family or noncommercial use. An indisputable example is the sale of farm implements. See House Conf. Rep., p. 25. Another instance is trucks, at least of some varieties, whose "retailability" is assumed in the legislative history,

*e. g.,* 95 Cong. Rec. 12497 (remarks of Senator Holland), and confirmed by the presence of another exemption in the Act that would otherwise be difficult to understand.[16] See also 95 Cong. Rec. 12495 (remarks of Senator Holland) (retailability of modest office desk). We cannot draw a precise line between such articles and those like industrial machinery which can never be sold at retail, see House Conf. Rep., p. 26, but a few characteristics of items like small trucks and farm implements may offer some guidance: their employment is very widespread as is that of consumer goods; they are often distributed in stores or showrooms and by means not dissimilar to those used for consumer goods; and perhaps it can be said that they are very frequently used in commercial activities of limited scope. While the list of strictly commercial items whose sale can be deemed retail is presumably very small, their existence precludes use of the uncomplicated "consumer goods" test proposed by the Administrator in 1949. See pp. 197–198, *supra.*

Within the category of goods and services that can be sold at retail, naturally not every sale can be so classified. The exemption itself excludes any sale for resale and beyond that, references in the legislative history, n. 14, *supra,* and common parlance certainly suggest that the term retail becomes less apt as the quantity and the price discount increase in a particular transaction. Again, we do not believe the word usage of the industry must

---

[16] Section 13 (a)(19), added in 1961 by 75 Stat. 73, 29 U. S. C. § 213 (a)(19) (1964 ed.), exempts from the minimum wage and overtime pay requirements "any employee of a retail or service establishment which is primarily engaged in the business of selling automobiles, trucks, or farm implements" regardless of whether the establishment meets the further tests of § 13 (a)(2), notably those added in 1961, see n. 4, *supra,* and accompanying text. Quite evidently this section contemplates that a business primarily selling trucks may be a retail establishment.

be given conclusive force. The legislative comments on discounting just cited are to the contrary; and the statute cannot easily be read to make usage control whether a particular sale is retail after we have rejected that test in deciding whether sale of a given item can ever be retail. The Secretary has in fact quite properly looked carefully at usage and practice in each industry before taking a position, 29 CFR § 779.323 (1965), but he cannot be hamstrung by the terminology of a particular trade. In view of the diversity of structure and marketing practices in different industries, flexibility is certainly appropriate, and we do not here further attempt to adduce general rules. We do note that the considerable discretion possessed by the Secretary as the one responsible for the actual administration of the Act should not be understressed. *Boutell* v. *Walling*, 327 U. S. 463, 471; see *United States* v. *American Trucking Assns.*, 310 U. S. 534, 549.

### III.

In light of the premises now established, resolution of the two cases before us can be accomplished readily. Turning first to Idaho Sheet Metal Works, we believe it is disqualified as a retail establishment by the 83% of its gross income derived from metal work relating to the potato processing equipment. The company has stressed the wide public it serves, the display racks and other retail facilities in its building, the irregular intervals at which work on the potato equipment is performed, and the company's lineage tracing back to the "tin shops" of yesterday. All these factors may bear upon the classification of its other sales, and if those were its sole business or three-quarters of it the company might well deserve the exemption. But § 13 (a)(2) is explicit in its treatment of establishments whose sales are variegated: a business is characterized by its sales and no more than

25% of the dollar volume may derive from sales designated nonretail without loss of the exemption. See n. 2, *supra*. In this instance 83% of the gross income is made by sale or servicing of the potato processing equipment and we do not believe those transactions before us can be labeled retail whatever the particular terms.

This last conclusion follows naturally from the admitted facts. The pretrial order described the potato equipment fabricated and maintained by Idaho Sheet as vats, storage tanks, hoods, elevator buckets, and chutes. Hoods were described at trial by one purchaser as being "five feet square on the bottom and about four feet high where they go to the vent stacks." He also testified that the tanks held as much as "5,000 pounds of peeled potatoes," and that chutes were about 12 feet long. If this testimony is not fairly representative of the nature of the equipment under scrutiny, there is no indication of that from Idaho Sheet, upon which lies the burden of establishing the facts requisite to an exemption. *Arnold v. Ben Kanowsky, Inc.,* 361 U. S. 388. The type of equipment described plainly appears to have no private or noncommercial utility. Nor does it bear much resemblance to those strictly commercial articles earlier named that may be sold at retail. Unlike small trucks and farm equipment, the market for these goods is highly limited, and far from being stock items purchased off the shelf, these articles were generally fabricated to meet individual specifications.[17] In the 83% of its business relating to the potato equipment, Idaho Sheet seems hardly distinguishable from "an establishment engaged

---

[17] The company relies upon *Wirtz* v. *Modern Trashmoval, Inc.,* 323 F. 2d 451, in which the Fourth Circuit as an alternative ground of decision held a trash collection business to be a retail or service establishment under the Act. We need go no further than to say the case is quite distinguishable; trash removal is not only a widespread need in the commercial world but is required by private families.

in the sale and servicing of manufacturing machinery and manufacturing equipment used in the production of goods," which the House Conference Report flatly stated could not be exempt. House Conf. Rep., p. 26. Since in our view this potato equipment cannot be the subject of a retail sale, we have no occasion to consider the company's claim that the pricing and quantity of its particular sales of the equipment conform to retail standards.

The second case, involving the Steepleton tire business, is in some respects more intricate. The Government has alleged, and Steepleton does not deny, that better than half the company's dollar volume derives from sales to companies operating fleets of commercial vehicles and other heavy industrial machinery such as earthmoving equipment. The Government's first ground for withholding the exemption is that tire transactions relating to large trucks and industrial vehicles are intrinsically nonretail whatever the terms. It analogizes these vehicles to industrial machinery and then would treat the tires just as the trucks. And it stresses the ties between these vehicles and interstate commerce.

Admitting that the argument has force, we do not accept it. Among the few strictly commercial articles that Congress pretty plainly viewed as retailable were trucks in at least some varieties, as we have already shown. No reason appears why the sale of tires for those trucks should be distinguished and not allowed to qualify as retailable items. The strength of the Government's position lies in its readiness to separate big trucks and tires from little trucks and tires. The Secretary, however, seemingly has chosen not to classify truck tires on this basis but instead treats all truck tires as capable of being sold at retail.[18]  A decision of this

---

[18] 29 CFR § 779.373 (1965) relevantly provides that for purposes of § 13 (a)(2) "all sales of tires, tubes, accessories and tire repair

kind, no doubt turning in part on problems of administration and facets of industry practice, clearly implicates the Secretary's discretion, and we see no cause to disturb its exercise in this case.

Steepleton is, nevertheless, deprived of the retail establishment exemption because—as the Government alternatively contended—it has failed to show that the tire dealings in question were made on terms and in circumstances that qualify them as retail within the Secretary's guidelines. The guidelines class as nonretail all sales to fleets of five or more vehicles at "wholesale prices," a wholesale price being defined as that charged on sales for resale or on sales to 10-vehicle fleets. See n. 18, *supra.* These guidelines, reportedly designed after inquiry into industry practices, are quite evidently aimed at excluding from the retail category sales generally made at significant discounts and in quantity. Given the common conception of the term retail and references in the legislative history to discount sales, see n. 14, *supra,* we see no reason not to sustain these guidelines; indeed, the company does not even appear to discuss them, save as is implicit in its claims that the Secretary's position here does not correspond to word usage in the industry.

In concluding that Steepleton has not proved itself exempt, a certain indefiniteness in the record should be noted. The Government showed at trial that many of

---

services, including retreading and recapping" are classified as retail, with a series of exceptions including:

"(d) Sales to fleet accounts at wholesale prices: . . . a 'fleet account' is a customer operating five or more automobiles or trucks for business purposes. Wholesale prices . . . are prices equivalent to, or less than, those typically charged on sales for resale. . . . If the establishment makes no sales of truck tires for resale, the wholesale price . . . [is] the price charged . . . on sales of truck tires to fleet accounts operating 10 or more commercial vehicles, or if the establishment makes no such sales . . . [it is] the price typically charged in the area on [such] sales . . . ."

the sales were to large fleets, that a number of purchasers said they received discounts, that the practice in the industry was to grant significant discounts for fleet sales, that some sales were for resale or pursuant to bids to public agencies, and pointed out other facts directed at showing nonexemption under the guidelines. Despite this evidence, there is unclarity as to the precise percentages of dollar volume attributable to the various sales that the guidelines label nonretail. However, the burden of proof respecting exemptions is upon the company, as earlier indicated, and since we uphold the Secretary's test, that burden has not been met. If Steepleton had alleged on appeal that it could meet the Secretary's standards if they prevailed, even then we would hesitate to order a remand since the Secretary's position has been known from the outset. In all events, Steepleton has not even claimed in this Court that the Secretary's standards could be met.

The judgment of the Court of Appeals in No. 30 is affirmed; the judgment of the Court of Appeals in No. 31 is reversed.

*It is so ordered.*