W. Willard **WIRTZ**, Secretary of Labor, United States Department of Labor, Appellant,

v.

**BROWARD MARINE, INC.,** et al., Appellees.

No. 23232.

United States Court of Appeals Fifth Circuit.

Feb. 23, 1968.

Bessie Margolin, Assoc. Sol., Anastasia T. Durau, Atty., Dept. of Labor, Washington, D. C., for appellant.

David A. Bartholf, Jacksonville, Fla., for appellees.

Before BROWN, Chief Judge, and COLEMAN and SIMPSON, Circuit Judges.

COLEMAN, Circuit Judge.

This action was brought by the Secretary of Labor under Section 17 of the Fair Labor Standards Act.[1] The complaint charged that from September 17, 1962 to August 21, 1964 Broward Marine and its president had violated overtime requirements of the Act. An order restraining future violations and enjoining the continued withholding of wages already owing the employees was accordingly sought.[2] Employers answered that

---

1. Act of June 25, 1938, c. 676, 52 Stat. 1060, as amended 29 U.S.C. 201 et seq.

2. The action was brought against Broward Marine, Inc. as well as Frank A. Denison, its president, and Walter J. Baldwin, Jr., its vice-president and comptroller. Plaintiff subsequently conceded that Baldwin was not shown to be an "employer" within the meaning of the Act and agreed that the complaint could be dismissed as to him. Defendants admitted that Deni-

the employees were exempt from the requirements of the Act under Section 13(a) (2) and (4) thereof, as it then existed.[3] The case was tried to the Court, which concluded that the employees had been employed in commerce and in the production of goods for commerce within the meaning of the Act. From this the employers did not appeal. In view of the holding of this Court in Bodden v. McCormick Shipping Corp., 188 F.2d 773 (1951) it is apparent that such an appeal would have had a poor chance of success. The Court further concluded that the employers' business is a "retail or service establishment", exempt, by virtue of Section 13(a) (2) and (4) aforesaid. From this the Secretary appeals. For the reasons hereinafter set forth the Judgment will be reversed in part and remanded for further proceedings.

Based on admissions, stipulations of the parties, and oral and documentary proof, the facts were found by the trial court as now set out.

The employer is a Florida corporation. Its office and principal place of business is located at Fort Lauderdale. It constructs, sells, builds, repairs, maintains, and stores boats. During the period involved in this litigation there were 137 employees, who were engaged in the repair, construction or building of boats.

Between January 31, 1963 and August 21, 1964, the employer, for named customers, built three boats which were sold, respectively, for $73,043.41, $300,547.06, and $296,102.06.

The figures were not broken down for the years 1962 and 1964, although there was general testimony with reference thereto. In 1963 the company receipts for repairs amounted to $462,414.28; storage $40,263.41; rentals $5,001.59; Miscellaneous, $8,633.98; total, $516,313.26.

With only one exception, all employees were paid only at their straight time rates for all hours worked.

Boats constructed, stored, and repaired by Broward have been used in travel to and from points outside the State of Florida for both business and pleasure.

From all the evidence it appears that the percentage of the employer's annual gross sales for resale amounted to less than 10% of the total, so more than 75% of annual gross sales were not for resale. With the exception of $322.50 all service and boat sales were made within the State of Florida.

The company established by the overwhelming weight of the evidence that at least 75% of the sales were and are recognized within the boating industry as retail sales and services.

While the Secretary points to asserted inadequacies in the proof we are of the view that the factual findings are supported by substantial evidence and

---

son is an "employer" and the court so found.

3. SEC. 13(a) The provisions of sections 206 and 207 shall not apply with respect to—* * * (2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located * * *. A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale, and is recognized as retail sales or services in the particular industry; or * * * (4) any employee employed by an establishment which qualifies as an exempt retail establishment under clause (2) of this subsection and is recognized as a retail establishment in the particular industry notwithstanding that such establishment makes or processes at the retail establishment the goods that it sells: *Provided*, That more than 85 per centum of such establishment's annual dollar volume of sales of goods so made or processed is made within the State in which the establishment is located; * * *

The Fair Labor Standards Amendments of 1966 (80 Stat. 830), which were enacted subsequent to the decision below to become effective February 1, 1967, made some changes in the wording of Section 13(a) (2), but such changes are in no way material to the issues presented by this case.

that they cannot be condemned as clearly erroneous.

The crucial issue, submerging subsidiary questions raised by the parties, is whether the Broward operation is ineligible for the statutory exemption as a matter of law. The Secretary says that an establishment primarily engaged in the *manufacture* and *repair* of ocean-going vessels is not of a retail character, and the sale of such "industrial type" services are not transactions to which the statutory retail concept applies.

Reiterating some of the findings above quoted it seems clear from the record that Broward Marine, Inc. operates what it advertises as the "largest shipyard in Florida"—a 16 acre installation which is connected with the Atlantic Ocean and the Intra-Coastal Waterway. The shipyard is equipped with a 200-ton marine railway, a 70-ton marine lift and a 35-ton crane for raising vessels from the water. It also has 40,000 square feet of construction buildings, including a machine shop, a welding shop, woodworking mills, a sheet metal shop, a paint department, a cabinet shop, an electrical and electronic department, an outfitting warehouse, fitting-out sheds, an engine overhaul shop, and a repair facility. Other facilities include a total of 90,000 square feet of covered wet and dry storage areas, yacht brokerage offices, a marine store and a central office. In addition, a plant for manufacturing large laminated wood products was also located at the shipyard until a month before trial, when it was discontinued.

Among the ships constructed during 1963 and 1964 were two 81 foot cruisers which were sold for $300,547 and $296,-102, and another craft which was sold for $73,043. Other ocean-going ships, including two 102 foot cruisers, were in various stages of production or design during this period, and another ship, built earlier, was sold for $160,000 during 1963. It was explained by Broward's president that some of these ships are built to customers' specifications, while others are built without prior orders.

Broward was also engaged extensively in performing major repairs on ships used by commercial enterprises, by the United States Government, and by yacht owners using their ships for business and chartering, as well as for pleasure. Such work has included $30,292 in repairs on the M/V Columbus chartered by the United States Navy to North American Aviation, and some $20,000 worth of repairs for Port Everglades Towing Company, including work on a United States Air Force T boat used by Port Everglades for the purpose of recovering Air Force missiles. Other ships repaired included torpedo retriever boats used by the United States Navy for recovering torpedoes fired for practice, and the 65 foot British registry M/V Sundev, used by Mackay Airlines for transporting goods from Fort Lauderdale to Bimini. Repair services are also supplied to charterers and others using yachts for business and pleasure. From January, 1963, through January, 1964, ships repaired by Broward ranged in size from 32 feet to 118 feet and the amounts billed individual customers on any one invoice ranged from $291 to $36,237.

Another major activity was that of Broward's laminating plant which provided laminated parts for Broward's boat construction, and which also built and sold laminated members to construction contractors for use in building churches and schools. Some of these products were sold directly to churches pursuant to formal bidding procedures. In addition, in 1963, Broward manufactured a laminated keel and other parts for the United States Navy, to be used in the construction of a 157 foot minesweeper being built in another shipyard. Sales of laminated products were estimated by Broward's comptroller to average between $3,000 to $3,500. This activity was discontinued about a month before trial in the spring of 1965.

Other income producing activities carried on at Broward's shipyard were the storage of yachts for which extensive facilities, both dry and wet, were available, and miscellaneous sales of marine

equipment, including those made at its marine store stockroom.

Its work force consists of naval architects, engine mechanics, machinists, carpenters, painters, welders, electricians, laborers, a purchasing agent, and office workers. The Secretary claims that many of the craftsmen employed by defendants, and the equipment with which they work, are used interchangeably on such activities as new boat construction and repairs. It is also claimed that the entire yard is one operation, with only one common entrance, although records were kept separately as to ship construction activities.

Subsequent to the decision of this case by the District Court, the Supreme Court decided Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694, rehearing denied 383 U.S. 963, 86 S.Ct. 1219, 16 L.Ed.2d 305 (1966).

After exhaustive consideration of the 1949 Amendments, including their legislative history, the Court rejected industry usage "as the single touchstone" for the meaning to be given the term retail as applied to a particular operation. It said, "[W]e do not believe word usage of the industry must be given conclusive force. * * * In view of the diversity of structure and marketing practices in different industries, flexibility is certainly appropriate, and we do not here further attempt to adduce general rules." [383 U.S. 204, 205, 86 S.Ct. 746]. The Court held that the potato equipment fabricated and maintained by Idaho Sheet, such as vats, storage tanks, hoods, elevator buckets, and chutes, did not qualify for the exemption because "unlike small trucks and farm equipment, the market for these goods is highly limited, and far from being stock items purchased off the shelf, these articles were generally fabricated to meet individual specifications". Since the potato equipment could not be the subject of a retail sale the claim that the pricing and quantity of sales involved conformed to retail standards was rejected. This was done despite proof that the sales were recognized by the industry as being retail sales —and the District Court had so held.

■ Applying the reasoning of the Supreme Court in Idaho Sheet Metal Works v. Wirtz, supra, we are constrained to hold that the construction [manufacture] and sale of ships, yachts, and large boats thus constructed by Broward Marine, as shown in this record, are not retail sales within the meaning of Section 13(a) (2) of the Act. The market for these vessels is highly limited. The majority of the boats appear to have been contracted for in advance of construction and built to pre-arranged specifications. Others were kept for extensive periods before a purchaser appeared, evidencing that such a product is not a stock item, available for purchase off the shelf by any significant portion of the general public, within the rationale of *Idaho Sheet Metal Works,* supra.

The same must be said of the production of heavy laminated wood products not used in the repair and maintenance of boats by the Broward operations.

■ As to Broward's operations in the repair, rental supply, and storage of boats, ships, and yachts, under the findings in this record, it is equally clear that exemption cannot be denied as a matter of law, Rachal v. Allen, 321 F.2d 449, 5 Cir., 1963, and 376 F.2d 999, 5 Cir., 1967.

■ This controversy involves approximately three months in 1962, all of 1963, and almost eight months of 1964. We are unable to ascertain from this record whether, excluding sales of ships and laminated wood products, for any one of these periods, Broward met, or could meet, the requirement that 75% of its total annual sales were retail sales within the meaning of the statute. Neither were there any findings as to interchangeable use of employees on construction and repair activities.

In this state of the record, while reversing the District Court as to the exemption for boat construction and sales thereof, we vacate and remand for further hearing and findings as to whether,

excluding this activity, and considering any other relevant factor, Broward may yet qualify for the exemption as to its operations in the repair, rental, supply, and storage of boats, ships, and yachts.

Reversed in part and vacated and remanded for further proceedings not inconsistent herewith.

JOHN R. BROWN, Chief Judge (dissenting in part):

I concur fully in the decision of the Court and the opinion except as to the limited holding that ship repair work of the kind revealed in this record can qualify as a "retail or service establishment." Such maintenance and repair activities bear no resemblance to the retail operation Congress had in mind. Although now bound by it I continue to disagree with Rachal v. Allen, 5 Cir., 1963, 321 F.2d 449, and 5 Cir., 1967, 376 F.2d 999, but in any event I do not think that case either warrants or requires the holding here. As to this limited holding I respectfully dissent.