George P. SCHULTZ, Secretary of Labor,
United States Department of Labor,
Plaintiff-Appellant,

v.

INSTANT HANDLING, INC., and Joseph
E. King, Individually, Defendants-
Appellees.

No. 27345.

United States Court of Appeals
Fifth Circuit.

Nov. 20, 1969.

Robert E. Nagle, Charles Donahue, Sol.
of Labor, U. S. Dept. of Labor, Harold C.

Nystrom, Acting Solicitor, Carin A. Clauss, Deputy Counsel, Washington, D. C., for appellate litigation, Beverley R. Worrell, Regional Atty., U. S. Dept. of Labor, Atlanta, Ga., Bessie Margolin, Associate Sol., Anastasia T. Dunau, Attys., United States Dept. of Labor, Washington, D. C., for appellant.

Charles S. Street, Tyson, Marr & Friedlander, Mobile, Ala., for appellees.

Before RIVES, COLEMAN and MORGAN, Circuit Judges.

RIVES, Circuit Judge:*

This action was brought by the Secretary of Labor under Section 17 of the Fair Labor Standards Act [1] to enjoin Instant Handling, Inc., and its general manager, Joseph E. King, from violating the Act's minimum wage, overtime and record-keeping requirements and to restrain the continued withholding of unpaid wages due 63 employees during the period from January 1, 1964 to September 22, 1966. Defendants denied that their employees were within the Act's general coverage and claimed, as an affirmative defense, that their business was exempt under section 13(a) (2) as a "retail or service establishment." The parties agreed to a stipulation of facts relating to the coverage and exemption issues.[2] The court ruled for defendants on both issues and entered judgment dismissing the complaint.

The facts as they appear from the stipulation and exhibits may be summarized as follows:

Defendants operated an industrial and commercial waste and trash removal service in Mobile County, Alabama. The service was available for any members of the public who chose to use it, but the costs of the service were such that it was in fact used only by industrial and commercial firms. Defendants furnished their customers with "specially designed containers" which ranged in size from two to six cubic yards. The six-cubic-yard containers held 1211.8 liquid gallons and were 40 times larger that the 30-gallon maximum-size container handled by the City's garbage department. If requested, defendants attached casters to these containers so they could be moved easily about the customer's premises. Defendants owned four collection trucks. Each of these trucks was equipped with a Dempster Dumpmaster which lifted the containers and emptied their contents into the truck body. The trucks also had "spray mechanisms" which were used to clean the containers where required for sanitary purposes at hospitals and restaurants.

Almost 60 percent of defendant's total business during the period in controversy represented work performed under contract for two industrial customers—the Scott Paper Company and Courtaulds North America, Inc. Both of these companies were major producers for interstate commerce. Defendants had approximately 140 other customers, many of which were also engaged in commerce or in the production of goods for commerce.

Defendant's largest single customer, Scott Paper, shipped over 90 percent of its total production (ranging from $57,-000,000 to $98,000,000) to points outside the State. Scott's contract accounted for 41 percent of defendant's income in 1964 and 57 percent in 1965. The waste collected by defendants from Scott Paper consisted of a wet, mud-like material called "sludge." Sludge was formed by conveying Scott's waste products through various filtering processes to a settling pond, and from there to a two-story tank or hopper located immediately outside the main plant.

---

* To avoid plagiarizing, the writer acknowledges that this opinion is borrowed in large part, but with some important changes, from the briefs of counsel.

1. Act of June 25, 1938, c. 676, 52 Stat. 1060, as amended, 29 U.S.C. 201 et seq.

2. Under the district court's pretrial order, a hearing on the nature and extent of defendant's alleged violations was deferred pending its determination of whether the Act was applicable.

Defendants were required to keep a truck under the hopper at all times, so that it could receive the sludge which was constantly forming. This meant that two of defendants' four trucks—and at times a third one—were assigned to Scott. When a truck was filled, it was driven by defendants' employees to the city dump, or to lands leased by defendants. The volume of such sludge and its nature and consistency were such that, had it not been regularly and systematically removed from Scott's plant and premises in Mobile, it would have seriously disrupted or stopped Scott's production processes. Scott could have accomplished the removal of the sludge physically by means other than hauling it away but in fact used the defendants' services. When dumping on lands leased by defendants, the employees used a bulldozer to spread and disperse the sludge, since an accumulation would prevent the entry of other trucks delivering subsequent loads for dumping.

Defendants were paid by Scott under a schedule which varied with the amount of sludge removed each day. They were guaranteed a minimum monthly payment of $3365,[3] which was based on an average daily removal rate of 142 cubic yards. In addition, the contract provided that, in the event of any unscheduled shutdowns, defendants would be paid $35 a day for the first 21 days. In practice, the sludge removal rate ranged from 110 to 531 cubic yards a day. It was stipulated that the failure to remove sludge "regularly and systematically" "would have seriously disrupted or stopped Scott's production processes."

Defendants also collected trash six times a week from the Scott Paper warehouse. This work was paid for separately, and was unrelated to the sludge removal operation.

Defendants' second largest customer, Courtaulds, accounted for 13.3 percent of their income in 1964 and 3.2 percent in 1965. Courtaulds, which employed 1000 workers, produced nylon and rayon staples for textile manufacturers. Eighty percent of its total production (over 3 million pounds a week) was shipped out of the state. Its primary waste product was a wet rayon material containing carbon bisulfide, the fumes of which were volatile and explosive. Before contracting with defendants, Courtaulds had experimented with several methods for disposing of this material—all of which were unsuccessful. For example, after constructing a large incinerator at the plant, it discovered that wet rayon waste does not burn; it then buried the rayon, but the material's sulphuric content ruined the soil and damaged the equipment used in its disposal; finally it tried storing the wet rayon in 55-gallon drums, but this method resulted in occasional explosions. Courtaulds found that it was more economical to pay defendants to haul the wet rayon waste away from their plant than it was either to salvage the material, or to maintain the personnel and equipment to haul it to their own dump site.

Under its contract with defendants, Courtaulds dumped the wet rayon waste (along with other debris, such as rayon sweepings, waste paper, rusted machine parts, etc.) into 30 large containers, which defendants collected and emptied four times a week. Each collection required 3 or 4 hours and constituted a full truckload, which made it necessary for defendants' employees to drive immediately from Courtaulds to the dump. It is stipulated that the "regular and systematic removal of * * * [Courtaulds' waste products] was necessary to production activities * * * because its continued presence would have blocked aisles, covered machines, impaired the flow of workers, materials, and productive processes throughout the plant until it would have completely stopped productive operations."

Defendants' other customers included manufacturing firms, trucking companies, warehouses, wholesaling firms, mo-

---

3. This amount was $3706 under the earlier contract in effect from August 1, 1962 to September 30, 1965.

tels, hotels, drug stores, food stores, and restaurants. They collected trash from these establishments on a regularly scheduled basis, making from one to seven pickups a week, depending on the specific needs of each customer. Among defendants' customers were Mobile Paint Manufacturing Company, Mercury Freight Lines, Star Fish & Oyster, Bemis Bag Company, Brown & Brown, Inc., Paper Products Company, Southern Bell Telephone & Telegraph, and Van's Photo Service. It is stipulated that these eight companies were regularly and substantially engaged in commerce or in producing goods for commerce, that waste disposal was essential to their safe and continued operation, and that defendants' employees individually spent up to five hours a week just collecting and removing waste materials from these eight customers alone.

While the stipulation does not give full details concerning defendants' other customers, it is apparent that many of them were also engaged in commerce or in producing goods for commerce—e. g., Alabama Power Company, Southern Railway Company, Gulf Transport Company, and Remington Rand.

The employees involved in this action were truck drivers, drivers' helpers, laborers, mechanics and mechanics' helpers. The drivers were assigned either to the sludge removal operation at Scott Paper, or to regular collection routes—which included stops at Courtaulds and the eight businesses described above. Helpers accompanied them in order to clean the containers, pick up spillage and assist generally. Defendants' other employees—laborers, mechanics and mechanics' helpers—worked in the repair shop, where they maintained, repaired and cleaned defendants' trucks and other equipment.

The stipulation contains no evidence on the question of whether 75 percent of defendants' annual dollar volume of sales of goods or services "is recognized as retail sales * * * in the particular industry" as is required for exemption under section 13(a) (2) of the Act.

On the basis of these facts, the district court concluded that "the operation of the defendant[s] in removing commercial and industrial waste from the premises of customers who are directly or indirectly engaged in interstate commerce is not so closely related or directly essential in commerce that such operation would be covered by the Fair Labor Standards Act." The court also concluded that "the defendant[s] qualif[y] under the exemption as a retail establishment as more specifically described in section 13(a) (2) of the Act."

## I.

As has been stated, approximately 60 percent of defendants' income for the years 1964 and 1965 was derived from services performed under contract for Scott Paper and Courtaulds, who shipped between 80 and 90 percent of their total production to points outside the State. Defendants admitted that the removal of industrial waste and other debris from the premises of these and other customers was essential to the continued operation of their customers' businesses. This work clearly constituted a "closely related process or occupation directly essential to the production" of goods for commerce, and defendants' employees were therefore within the Act's coverage.[4]

Further, the work of defendants' employees was closely analogous to that of maintenance and custodial employees who have consistently been held covered by the Act on the ground that their services—

---

4. The Fair Labor Standards Act applies, *inter alia*, to all employees "engaged * * * in the production of goods [for commerce]," and defines this term in section 3(j) as follows: " * * * for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such empoyee was employed in producing, manufacturing, mind-

ing, handling, transporting, or in any other manner working on such goods, or *in any closely related process or occupation directly essential to the production thereof*, in any State" (italics added). The italicized words were substituted by the 1949 amendments to the Act for the words "or in any process or occupation necessary to the production thereof."

including the removal of trash [5]—bear a close and essential relationship to the functioning of industrial plants or office buildings in which productive operations for commerce are carried on. Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Borden Co. v. Borella, 1945, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865; Public Building Authority of City of Birmingham v. Goldberg, 5 Cir. 1962, 298 F.2d 367; Nunn's Battery & Electric Co. v. Wirtz, 5 Cir. 1964, 335 F.2d 599; Allen v. Atlantic Realty Company, 5 Cir. 1967, 384 F.2d 527, cert. den., 390 U.S. 989, 88 S.Ct. 1185, 19 L.Ed.2d 1294.

This analogy to maintenance and custodial work was applied in Mitchell v. Dooley Bros., Inc., 1 Cir. 1960, 286 F.2d 40, cert. den. 366 U.S. 911, 81 S.Ct. 1086, 6 L.Ed.2d 236, where the First Circuit, after thorough analysis of the legislative history of the 1949 amendment, concluded that the employees of a trash removal service similar to the one involved here were engaged in work that was "closely related" and "directly essential" to the production of goods for commerce. The same result was reached in Wirtz v. DeBoer Bros., 16 WH Cases 905, 51 CCH Lab.Cas. ¶ 31,695 (N.D.Ill.1965; not officially reported) on the basis of *Dooley*, and this Court has also cited *Dooley* with approval. *See* Nunn's Battery, *supra*, 335 F.2d at 601.

The district court relied on the Fourth Circuit's decision in Wirtz v. Modern Trashmoval, 4 Cir. 1963, 323 F.2d 451, cert. den., 377 U.S. 925, 84 S.Ct. 1222, 12 L.Ed.2d 216. This reliance was clearly misplaced. The factual differences between that case and this require a different result. In *Modern Trashmoval*, the court found that the record contained no showing "that a large proportion of Modern's business was related

to production for commerce" or that Modern's employees had "more than a few minutes * * * contact" each week with interstate producers. (323 F.2d at 462.) Here, in sharp contrast, the stipulation clearly shows that defendants' employees were engaged in activities which were "dedicat[ed] either exclusively or primarily" to the production of goods for commerce—as in the case of sludge removal at Scott Paper. *Cf. Modern Trashmoval,* 323 F.2d at 461.

Defendants' employees provided services directly to the operating processes of interstate producers, and were therefore clearly covered under section 3(j) of the Act. It is immaterial that the duties of some of defendants' employees also included noncovered activities pertaining to firms which were not engaged in commerce or in the production of goods for commerce. The courts have repeatedly held that the Act applies to employees engaged in the same workweek partly in interstate and partly in intrastate activities. Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Stewart-Jordan Distributing Co. v. Tobin, 5 Cir. 1954, 210 F.2d 427, cert. den., Stewart-Jordan Distributing Co. v. Mitchell, 347 U.S. 1013, 74 S.Ct. 866, 98 L.Ed. 1136; *Dooley, supra,* 286 F.2d at 43–44; Guess v. Montague, 4 Cir. 1943, 140 F.2d 500.

## II.

In holding, as an alternative ground for its decision, that defendants' business was exempt from the Act's requirements as a "retail or service establishment," the district court again erred. First, defendants offered no evidence to show that at least 75 percent of their sales were "recognized as retail * * * in the particular industry," which is "one of the prerequisites" for exemption under section 13(a)(2).[6]

---

5. See Borella v. Borden Co., 2 Cir. 1944, 145 F.2d 63, 64; Nunn's Battery & Electric Co. v. Wirtz, 5 Cir. 1964, 335 F.2d 599, 600.

6. The pertinent portion of section 13(a)(2) reads:

"13(a) The provisions of sections [6] and [7] of this title shall not apply with respect to—

* * * * *

"(2) any employee employed by any retail or service establishment more

Tobin v. Celery City Printing Co., 5 Cir. 1952, 197 F.2d 228, 229; Arnold v. Ben Kanowsky, Inc., 1960, 361 U.S. 388, 393, 80 S.Ct. 453, 4 L.Ed.2d 393. It is, of course, settled that defendants had the burden of proof on this issue, and that they were required to meet it "plainly and unmistakably." Idaho Sheet Metal Works, Inc. v. Wirtz, 1966, 383 U.S. 190, 209, 86 S.Ct. 737, 15 L.Ed.2d 694, reh. den., 383 U.S. 963, 86 S.Ct. 1219, 16 L.Ed.2d 305; *Kanowsky, supra,* 361 U.S. at 392, 80 S.Ct. 453; Mitchell v. Kentucky Finance Co., 1959, 359 U.S. 290, 295, 79 S.Ct. 756, 3 L.Ed.2d 815; Acme Car & Truck Rentals, Inc. v. Hooper, 5 Cir. 1964, 331 F.2d 442, 447; Acme Tire & Battery Co. v. Wirtz, 5 Cir. 1964, 330 F.2d 116, 118.

■ Apart from defendants' failure to meet their burden of proof on industry recognition,[7] the stipulated facts demonstrate that defendants' services in removing industrial and commercial waste—which required the use of specially designed containers and trucks equipped with lifting devices and spraying mechanisms—were so unlike any service rendered to the general consumer as to preclude their classification as "retail" under section 13(a)(2). Idaho Sheet Metal Works, Inc. v. Wirtz, *supra,* 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694; Mitchell v. Kentucky Finance Co., *supra,* 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed. 2d 815; Wirtz v. Broward Marine, Inc., 5 Cir. 1968, 390 F.2d 788; Wirtz v. Floridice Company, 5 Cir. 1967, 381 F.2d 613.

■ Like the sale and servicing of "potato processing equipment" in *Idaho Metal Works, supra,* defendants' sludge removal at Scott's and its other services obviously bear no similarity to what the Supreme Court described as "the typical retail transaction," *i. e.,* the sale of those types of goods and services "that are frequently acquired for family or personal use" and which are "often purchased by householders" from such establishments as " 'the grocery store, the hardware store, the coal dealer, the automobile dealer selling passenger cars or trucks, the clothing store * * *'." *Idaho Metal Works, supra,* 383 U.S. at 203, 86 S.Ct. at 746. See also *Broward Marine, supra,* where this Court held that the construction and sale of large boats did not qualify as "retail" since "the market for these goods is highly limited, and far from being stock items purchased off the shelf, these articles were generally fabricated to meet individual specifications." 390 F.2d at 792. Here, the containers used by defendants were 40 times larger than the maximum size used by private householders, and were designed to accommodate the bulk and type of waste produced by their industrial customers.

The only authority cited by the district court for its holding on the retail point is *Modern Trashmoval, supra.* That case is clearly distinguishable. Thus, in finding that Modern's trash service was retail, the Fourth Circuit emphasized that it rendered "relatively small amounts of service * * * at each stop," (323 F.2d at 466) and that its "service satisfie[d] the everyday needs of the general community." (323 F.2d at 463.) In the present case, defendants' services—far from supplying the "everyday needs of the general community"—were specifically designed to meet the particular needs of large manufacturing firms and other business establishments, as distinguished from private householders. Nor did defendants extend their services in "small amounts."

than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, * * *. A 'retail or service establishment' shall mean an establishment 75 percentum of whose annual dollar volume of sales of goods or services (or both) is not for resale and is recognized as retail sales or services in the particular industry * * *."

7. *Defendants' averment in their unsworn answer that Instant Handling "is an establishment 75 per centum of whose annual dollar volume of sales of services*

Indeed, 57 percent of their income was derived from their sludge removal contract with Scott Paper—clearly not a retail service.

The judgment of the district court is reversed and the cause remanded for further proceedings [8] consistent with this opinion.

Reversed and remanded.

---

\* \* \* is recognized as retail services in the particular industry" cannot supply this deficiency in the record evidence.

8. See footnote 2, *supra.*