**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**A-1 AMBULANCE SERVICE, INC., Defendant.**

**No. LR 67 C 164.**

United States District Court
E. D. Arkansas, W. D.
April 15, 1969.

Carl W. Gerig, Jr., U. S. Dept. of Labor, Atlanta, Ga., for plaintiff.

E. H. Herrod, Loftin Herrod & Cole, North Little Rock, Ark., James W. Moore, Smith, Williams, Friday & Bowen, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

GORDON E. YOUNG, District Judge.

The plaintiff seeks to enjoin the defendant from violating certain provisions of the Fair Labor Standards Act of 1938, as amended 29 U.S.C.A. § 201 et seq. The provisions referred to involve only the minimum wage and recordkeeping provisions of the Act. Recovery of unpaid wages is not sought.

The complaint alleges, inter alia, that the defendant has employed up to 26 present and former employees who have been regularly engaged in interstate commerce or the production of goods for commerce within the meaning of the Fair Labor Standards Act by virtue of their transportation of sick, injured, or dead persons in ambulances; thereby utilizing or aiding the functioning of instrumentalities and facilities of commerce, including highways, airports, and land and air vehicles. Thus, said employees are engaged in commerce as defined by the Act and the defendant employer is subject to the recordkeeping provisions of the Act, and it has completely failed to make, keep, and preserve adequate records of its employees' wages and hours as described by the regulations.

The defendant contends that the ambulance service work of its drivers and attendants does not constitute activities of such a nature as to subject defendant to the provisions of the Fair Labor Standards Acts.

The major portion of its business is devoted to local calls from homes to hospitals and hospitals to homes, and carrying bodies to and from funeral homes. As affirmative defenses the defendant pleads the "retail or service establishment exemption" contained in Section 13(a) (2) of the Act as amended, 29

U.S.C.A. § 213(a) (2), and the "taxicab exemption" contained in Section 13(a) (12) of the Act as amended, 29 U.S.C.A. § 213(a) (12).

The evidence established that the defendant was and is the only authorized ambulance service permitted to provide emergency ambulance service within the City of Little Rock, Arkansas. Requests for ambulance service received by the Little Rock Police Department were and are referred to defendant 24 hours a day; and an employee of the defendant monitors radio transmissions by the Little Rock Police Department and the Arkansas State Highway Patrol, District No. 1, which has jurisdiction over the Greater Little Rock area.

The defendant also provides the only authorized ambulance service for Adams Field, the major commercial airport located in the City of Little Rock. Interstate carriers providing regularly scheduled air service for the City of Little Rock and vicinity include American Airlines, Braniff, Delta, Frontier, and Trans-Texas.

The defendant employs and maintains emergency crews for its ambulances 24 hours a day; and regularly during each such period receives from individuals and local officials emergency requests to respond to vehicular accidents occurring on city streets, state highways, and interstate highway systems converging at Little Rock which are part of the network of roads and highways servicing the Greater Little Rock area. Government's Exhibits 1 and 2 are maps indicating the interstate routes which intersect the City of Little Rock and Pulaski County, reflecting that these include Interstate Highway 40, Interstate Highway 30, and U.S. Highways 65, 67 and 70.

The government's exhibit No. 3, "Travel in Arkansas During 1967," is an economic analysis of the travel serving business prepared for the Arkansas Publicity and Parks Commission, State of Arkansas. It indicates that: "During 1967 out-of-state automobiles were driven 926 million vehicle miles on Arkansas highways, where they accounted for nearly ⅒ of all vehicular traffic."

It also indicates that the City of Little Rock and Pulaski County, Arkansas had more than 1.6 million out-of-state visitors who traveled 183 million miles on interstate trips in Arkansas.

Mr. Stanley Ledbetter, the defendant's manager since July 1967, testified that four or five calls were received during each 24 hour period from accidents on city streets and highways, and about five calls monthly from accidents on interstate highways. Mr. Ledbetter testified further that upon arriving at the scene of an accident it is the ambulance crew's responsibility to do "whatever we need in the first aid line to keep the patient alive to get them to a physician and medical care." Occasionally calls were received from the airport involving crashes or sick persons on planes. At the time of the trial there were 11 employees, 10 of whom lived on the premises of the defendant, being subject to call 24 hours a day, except for one and one-half days a week, which was designated as free time.

The defendant kept no pay records on these men, but paid them by the day. Recently the defendant has started using trip tickets which indicate the time the men are out on ambulance trips, but no record is kept of the time they are on duty subject to call each day. No records are maintained to separate the emergency calls involving nonhighway accidents and occurrences from vehicular accidents upon city streets, roads and interstate highways.

Mr. Kenneth White, vice-president and part owner of A–1 Ambulance Company, testified that he recalled at least two occasions on which the defendant had been investigated by a representative of the Department of Labor for Wage and Hour purposes, and that a "Mr. Edwards" suggested that they maintain records showing the daily hours of the employees. He also testified that they still did not maintain any records of daily hours, even on an informal basis. The only records kept were the logs of

the calls actually received and trips made in response thereto.

Mr. Edwin O. Krouse, president of the defendant company, testified that ten percent of the company's business was from outside Pulaski County, and the remaining ninety percent was divided, with forty percent being attributable to emergency calls of accidents at home or on the highways or severe illness, and the other fifty percent being non-emergency calls, and that the revenues from service to funeral homes was one percent or "even less" of the gross revenues.

The men live on the premises 5½ days per week. They are allowed to take time off for three meals a day and personal errands such as shopping and haircuts. He stated that they usually drive an ambulance when they go to eat and on some of their errands, and when they take an ambulance they are subject to call even during these intervals. They sleep a good deal at night, and some of them sleep all night if they are not needed.

He testified further that the living quarters which the employees are furnished on the premises are estimated as worth between $12 to $15 per week, and other items such as uniforms, laundry and linens are worth about $8 per week. The defendant is now paying a minimum of $75.00 per week to the employees, and after an apprenticeship this is raised to $80.00 per week.

He also stated that for a one year period ending June 30, 1968, the defendant had a contract with the United States to provide the Veterans Administration Hospital at Little Rock with ambulance services, but when the contract expired the defendant was underbid by a North Little Rock firm. However, Mr. Krouse also testified that A–1 Ambulance planned to bid again when the time for submitting new bids arrived. The defendant's daily trip log reflected that during the time the contract was in effect a substantial number of trips were made to service the Veterans Hospital.

The testimony of Mr. Marvin A. Harvill, former stockholder, mechanic and manager of A–1 Ambulance Company, who worked for the company from 1961 to September 1966, confirmed the testimony of Mr. Ledbetter concerning the approximate number of calls received on city streets, highways and interstates. He also testified that disabled persons were frequently found on the streets and highways or in the wrecked vehicles on the highways.

He said he started at a salary of $35.-00 per week in 1961 and was making $50.00 a week when he left the company in 1966. The testimony of other former employees was substantially to the same effect concerning calls received and rate of pay.

■ The first issue for determination in this case is whether the employees of the defendant are engaged in interstate commerce or in the production of goods for interstate commerce, or in an occupation closely related or directly essential thereto. In ascertaining the purpose of the Act we refer to that often quoted case of Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943), in which the Court said:

"It is clear that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce." 317 U.S. at 567, 63 S.Ct. at 335.

In Austford v. Goldberg, 292 F.2d 234 (8 Cir. 1961), the court found that employees working on state and county roads were afforded coverage by the Act and in that case stated:

" * * * it is not material that the roads are not themselves interstate highways but are feeders or extensions within the reaches of the main channels."

In Crook v. Bryant, 265 F.2d 541 (4 Cir. 1959), the court considered whether a night watchman and janitor was engaged "in commerce" where he answered all telephone calls including those for 24-hour wrecker service which the employer contracted to provide to the West Virginia Turnpike Commission over a 19

mile portion of a turnpike running from two cities within the state. The court said:

> "The turnpike, as shown by highway maps introduced into evidence, is a connecting link of the system of interstate highways and thus serves as an instrumentality of interstate commerce although it lies solely in a single state; and the services of the employee, insofar as they help to maintain the road free from obstruction, facilitate the flow of commerce from state to state."

■ Many other cases, as well as interpretative rulings of the Administrator, illustrate the far reaching effect of the Act. Although interpretative bulletins and rulings of the Administrator are not binding on the courts, they are entitled to careful consideration. In January of 1966 in Opinion Letter No. 424, C.C.H. Labor Law Reporter, Wages-Hours, Administrative Rulings, Paragraph 30,996.55, the Administrator held that ambulance drivers and attendants making intrastate trips to pick up, remove and transport injured or deceased victims of motor vehicle accidents on public streets and highways are engaged in interstate commerce within the meaning of the Act, and that both public policy and police practice require that such persons must be attended to before the wrecked and disabled vehicles can be moved so that normal flow of traffic can be resumed. "Consequently, the ambulance service is so closely related to the movement of commerce and the functioning of its instrumentalities as to be a part of commerce."

In Duffy v. Oele, 274 F.Supp. 307 (Mich.1967), which reaffirms the rationale of the Administrator's Opinion Letter 424, *supra*, plaintiffs were employed by the defendant as ambulance drivers. Their work involved transporting sick and injured persons between their residences and hospitals and making intrastate emergency trips to pick up dead and injured victims of automobile accidents on public streets and highways. The court held that these employees were engaged in commerce and entitled to the protection of the Act.

■ In the case at bar the employees of A–1 Ambulance are engaged in essentially the same type of activity. It is evident that the defendant employs and maintains emergency crews for its seven ambulances 24 hours per day. In any given 24 hour period the defendant receives from city police and state highway patrolmen emergency requests to respond to vehicular accidents occurring on city streets, state highways, and interstate highway systems. These are a part of the network of roads and highways servicing the Greater Little Rock area, and the calls are monitored by an employee of the defendant, as was done in the *Crook* case, *supra*. The record indicates that the activities of the defendant's employees in response to the requests for service upon these routes of travel are not sporadic or isolated, but are regular and continuous. In light of these daily activities and the applicable law, we find that the defendant's employees were engaged in commerce within the meaning of the Fair Labor Standards Act.

■ Since we have reached the conclusion that the nature of the employment brings the employees within the coverage of the Act, we must now determine the validity of defendant's position in connection with the two claimed exemptions. The burden is on the employer to prove his right to any exemption under the Act. See Arnold v. Ben Kanowsky, 361 U.S. 388, at 392, 80 S.Ct. 453, at 456, 4 L.Ed.2d 393 (1960), where the Court said:

> " * * * these exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."

See also Idaho Sheet Metal Works, Inc., et al. v. Wirtz (1966), 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694.

■ We find no merit in defendant's contention that it should be exempt from

the provisions of the Act under the "retail or service establishment exemption," Section 13(a) (2) of the Act. Defendant claims that only a small number of its calls relate to highway accidents, and all others are local in character, therefore its services are retail in nature. This same argument was advanced in the *Duffy* case, *supra,* and there it was rejected by the court. One of the requisites for qualifying for the exemption is that the defendant's activities be recognized as retail by the industry. Here we find that defendant's ambulance service establishment is engaged in providing a specialized form of transportation for sick, injured, aged or handicapped persons and as such is essentially a branch of the transportation industry and is not within the scope of the "retail concept" as recognized within the industry. Mitchell v. Kentucky Finance Co., 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959), and Telephone Answering Service v. Goldberg, 290 F.2d 529 (1 Cir. 1961).

Neither do we find any merit to defendant's contention that it is entitled to the "taxicab exemption" provided by Section 13(b) (17) of the Act. It is quite apparent that ambulances do not serve the same ordinary transportation needs as taxicabs but are designed as specialty vehicles to provide emergency care to sick or injured persons enroute to medical facilities, and therefore they do not qualify for the "taxicab exemption."

Construing the record in the light most favorable to the defendant, the combined amount of wages and allowances for living quarters and other fringe benefits received by defendant's best paid employees (excluding Mr. Ledbetter) did not compensate the affected employees for the number of hours worked at the current minimum wage of $1.60 per hour.

The testimony establishes a workweek of five and one-half consecutive 24 hour days, for a total of 132 hours. Even granting an allowance for sleeping time, which under the present record might not be permissible, and also for off-duty time, there still remains a number of uncompensated hours for those who receive a salary of $80.00 per week; and, of course, an even greater number of uncompensated hours for those newer employees who received a weekly salary of $75.00.

The defendant offered no explanation as to its failure to maintain adequate records of the hours of work and conditions of employment of its employees. Further, it is not denied that representatives of the Wage and Hour Division had called the need for records to the attention of the defendant on at least two occasions prior to the instigation of this action. Under the circumstances of this case we find that an injunction against further violations of the minimum wage and recordkeeping provision of the Act is proper, and an appropriate order will be entered to this effect.