Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

Larry YATES, Defendant.

No. C-74-52-E.

United States District Court, W. D. Tennessee, E. D.

Oct. 10, 1975.

Ralph D. York, Trial Atty., U. S. Dept. of Labor, Nashville, Tenn., for plaintiff.

Frederick J. Lewis of Weintraub & DeHart, Memphis, Tenn., for defendant.

## MEMORANDUM OPINION

WELLFORD, District Judge.

During 1965, defendant Larry Yates purchased a filling station in Martin, Tennessee. The station was known as Gateway Service Station (hereinafter called Gateway), and was located on premises of Argo-Collier Truck Lines Corporation (hereinafter called A–C), a common carrier by motor vehicle operating over irregular routes from the principal Martin office in a number of states by Interstate Commerce Commission authority. A–C was originally a defendant in this case, and disposition has previously been made of the charges of wage-hour law violations by A–C in this cause. Yates d/b/a Gateway has similarly been charged with violations of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201 et seq.).

Gateway occupied since 1965 a small portion of the general offices of A–C, though it is a separately functioning enterprise. Yates has no interest in A–C as a stockholder, officer, director or employee.[1] The premises face on Highway 45 East, a heavily travelled federal highway, and there is a large paved area available to Gateway but owned and used by A–C in the course of its trucking operations. Gateway may accommodate large trucks for gas and diesel fuel service. There is a standard "D–X" gas sign at each driveway entrance to Gateway (and to A–C), and there is also another sign, "Thermal King Refrigeration Repair" at one of the entrances. There is a service and repair shop on A–C premises which is an entirely separate operation and enterprise from Gateway. This service facility handles trucks and truck refrigeration units, but Yates has no part in nor any financial interest in this business of A–C. Gateway itself has no facility to repair or to service automobiles, much like many present day "self service" gasoline stations.

Gateway sells only diesel fuel, gasoline and a relatively small amount of motor oil; the majority of its business is composed of sales of diesel fuel to motor transport trucks, but it also sold diesel fuel to trucks and farm vehicles. Approximately 89% of the total gallons sold during the period in question consisted of diesel, and the sales of diesel constituted approximately 85% of Gateway's total annual dollar volume of business during the period since August, 1971. Of the total dollar volume of diesel and gasoline sales, approximately 73% constituted sales made to A–C. The great majority of purchases made by A–C consisted of the fueling of trucks which commonly were commencing an interstate journey or terminating an interstate journey within the State of Tennessee.

The station was under lease from the Sun Oil Company and Yates paid rent to the Sun Oil Company for the use of the premises and the equipment during the time that he operated the station, consisting of an office area and an equal number of gasoline and diesel pumps situated on two islands. The service station is plainly visible from the highway and is recognizable from the highway as a service station. There was no advertising for or solicitation of the business of trucks and no indication from the highway or at the station that diesel fuel was sold.

The station was open to the general public at all times. Gasoline was sold to automobiles and trucks. Diesel fuel was sold to automobiles, trucks and farm vehicles. Motor oil and certain accessory parts were sold to and placed in automobiles. No preference in price was made to any customer or group of customers of the station. The station operated on a "first come—first serve" basis. Gateway did not encourage or permit parking of trucks in or about the vicinity of the station or its pumps; A–C trucks, of course, utilized the common parking area adjacent.

All sales made by Gateway were made in Martin, Tennessee, and all sales made

---

1. Neither does A–C have any corresponding interest in Gateway.

by the station were sales to the ultimate consumer or user and no sales were made of products which were to be resold. Gateway pays Federal and State Retail Taxes on all diesel fuel sold. The station has retail licenses in the name of Gateway Service Station.

The president of A–C testified that as of July, 1973, A–C changed over its method of operation and began contracting to have its routes run only with drivers who had trucks. Despite the fact that A–C operated without its trucks in August, 1973, sales to A–C still constituted in excess of fifty-six percent (56%) of the volume of business of Gateway for that month. Approximately five percent (5%) of all sales of diesel fuel to fuel A–C was to trucks commencing and terminating their trips within the confines of the State of Tennessee.

A–C trucks did not usually take on a capacity load of fuel at Gateway because drivers are instructed to buy their fuel at authorized stops within a given state to insure the amount spent on fuel within the state will balance with the number of miles traveled there. Otherwise, A–C might be liable to pay the amount of the state's fuel tax for the miles driven within the state on non-local fuel. It is likely and most probable that the majority of fuel purchased in Tennessee from Gateway was used in Tennessee and not in another state, particularly since A–C has four (4) other authorized stops in Tennessee.

Since A–C trucks were refrigerated, the refrigeration units of these trucks burn diesel fuel at all times. Martin, Tennessee, was the "home" stop for most of the drivers for A–C, which allowed them to come through Martin on any run which included the State of Tennessee. Consequently, much time was spent with trucks on the lot of A–C in Martin, Tennessee, while fuel was being consumed for refrigeration. Approximately forty percent (40%) of A–C's use of diesel fuel was in the refrigeration units.

In June, 1972, Yates' nephew, Timothy Jones, came to live and board with the Yates, and desired to work at the station. Because his nephew was only sixteen years of age, the Yates inquired of a public accountant whether the Child Labor Laws would prohibit his employment. He, at Mrs. Yates' request, called John Simmons, the area representative of the Wage and Hour Division, for information. The accountant, Copeland, and Mrs. Yates testified that Simmons was told the name of the station about which the inquiry was being made and that Simmons told them Gateway was exempt from coverage under the Wage and Hour Laws after asking the volume of business done by the station and learning that it was less than two hundred fifty thousand dollars per year. Simmons, on the other hand, testified that he remembered the call but that he never knew the name of the station involved and he could not remember the content of all the numerous telephone calls he receives.

The proof shows that Gateway paid its employees wages ranging from $10 to $15 per 12 hour shift and that most of the employees worked in excess of 40 hours a week for which excess hours they received no additional overtime compensation.

Yates operated the station twenty-four hours a day, seven days a week, and continued the system of using two employees, each with a twelve hour shift for each day until the summer of 1973. At that time, one employee continued to work a twelve hour shift and another employee worked a four hour shift. At no time when Yates operated the station was more than one employee regularly working at any time.

In addition to his brother, Tyler Yates, and his nephew, Timothy Jones, referred to above, Larry McCollum, another employee, was married to Yates' brother's daughter. McCollum was a full time student at the University of Tennessee at Martin during the entire time that he worked at the station.

Yates supplied him with additional money with which to pay his tuition and to pay for his books each school quarter in addition to his Gateway compensation.

Although defendant's employees were engaged in fueling motor carriers transporting goods from, to and through Tennessee and in selling diesel fuel for refrigeration of interstate goods in transit, the Gateway operation was not essentially different from a retail service station operation in many aspects. As set out in *Mitchell v. Vollmer & Co.*, 349 U.S. 427, 429, 75 S.Ct. 860, 862, 99 L.Ed. 1196 (1955), "the test is whether the work is so directly and vitally related to the . . . facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity." Compare *McLeod v. Threlkeld*, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538 (1943).

The facts of this case are clearly distinguishable from *Hodgson v. Lockwood*, 70 Labor Cases, ¶ 32,829 (D.C.Ind.1972) because defendant was not engaged in truck repair services and because there was a significantly greater retail activity with non-truckers. Gateway was not a "truck stop," and thus its services did not necessarily lack the retail concept associated with the filling station that serves automobiles and farm or local vehicles. *Hodgson v. Pipeline Oil Co.*, CCH Labor Law Reports, 69 LC ¶ 32,791 (W.D.Ky.1972) is therefore inapplicable here, as is Sec. 776.11 of plaintiff's regulations. The work of defendant's employees is not considered by this court "so related to the actual movement of commerce as to be considered an essential and indispensable part thereof, and without which it would be impeded or impaired". (Reg. 776.11(d)). Compare *New Mexico Public Service Co. v. Engel*, 145 F.2d 636 (10th Cir. 1944). The activity reflected on the record seems essentially local and retail rather than intimately involved in interstate commerce.

■ Defendant has the burden of establishing that it is a retail or service establishment and therefore entitled to exemption under section 13(a)(2) of the Fair Labor Standards Act. While the interpretations and regulations under Fair Labor Standards Act issued by the plaintiff Secretary of Labor are entitled to considerable weight, the court does not construe Reg. 779.371(c)(6) to apply in this instance. See *Wirtz v. Steepleton Gen. Tire Co.*, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966). Gateway does not render services customarily expected of and attributable to truck stops. It did not offer a variety of services to truckers on a "one stop" basis.

■ The court concludes that this business is within the traditional retail concept and that defendant has carried a bare burden of demonstrating that it comes within the section 13(a)(2) exemption category. The sales that were made were not for resale and were recognized as retail in the industry. *Dial v. Hi Lewis Co.*, 99 F.Supp. 118 (D.C.Mo. 1951); *Shultz v. Southern "500" Industries*, 19 WH Cases 139 (M.D.N.C. 1969); *Harlow v. Bud Lake Truck & Car Stop*, 261 F.Supp. 191 (D.C.Mont. 1966). Compare *Hodgson v. Lyles*, 335 F.Supp. 128 (Md.1971) aff'd 468 F.2d 625 (4th Cir. 1972). There was certainly no wilfull violation of the act by defendant under the circumstances related as originally contended by plaintiff in this cause despite the fact that a majority of defendant's fuel sales were to A–C or its drivers during the period in question, and despite the fact that its record-keeping left something to be desired. The court concludes that defendant did not violate 29 U.S.C. §§ 206, 207 nor 211 of the Fair Labor Standards Act. Defendant Yates did not participate with A–C in a unified operation nor did he operate under common control with A–C.