David C. Godbey, United States District Judge
This case was tried to the Court. Based on the record before the Court, as well as the briefing of the parties,[1] the Court makes its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1) as follows:
I. BACKGROUND
This is a suit for unpaid overtime under the Fair Labor Standards Act, 29 U.S.C. §§ 201 - 19 and the Portal-to-Portal Pay Act, 29 U.S.C. §§ 251 - 52 (collectively, "FLSA"). The Court has jurisdiction over the parties and the subject matter of this case. 28 U.S.C. § 1331. Plaintiffs were employees of Defendant Latshaw Drilling Company, LLC ("Latshaw"). All parties agree that the FLSA applies to this case. The dispute is over whether certain money paid to Plaintiffs should be included in Plaintiffs' regular rate of pay. If those items are included in the regular rate of pay, that would increase the amount of time and a half overtime pay that Plaintiffs should have received.[2]
The dispute raises three main issues. First, some drilling operations performed by Latshaw involved the use of oil based mud ("OBM"). Every shift that OBM was used, Latshaw paid every employee additional money per shift in the amount of *589 $25-35. The parties dispute whether the OBM pay should be included in the regular rate of pay. Second, Latshaw was hired by operators to drill wells. Some operators would pay a performance bonus if the well was completed ahead of schedule. The parties dispute whether the completion bonuses should be included in the regular rate of pay. Finally, the parties dispute whether Latshaw's failure to pay appropriate overtime was willful. As discussed below, the Court finds that both OBM pay and completion bonuses should have been included in regular rate of pay, but that Latshaw's error was not willful. The Court will discuss each issue in turn.
II. OIL BASED MUD
A. Fact Findings
Generally speaking, drilling mud is a type of drilling fluid, which is "a preparation of water, clays, and chemicals circulated in oil-well drilling for lubricating and cooling the bit, flushing the rock cuttings to the surface, and plastering the side of the well to prevent cave-ins." See https://www.merriam-webster.com/dictionary/drilling%20fluid. Some formulations of drilling mud replace the water with petroleum products, such as diesel, fuel oil, or crude oil. This is called oil based mud, or OBM, in contrast to water based mud.
Latshaw is a privately owned drilling company. It is in the business of providing drilling services to "operators," which are oil and gas companies that have acquired the right to search for and produce oil and gas in a particular area. Latshaw would enter into written contracts with operators to drill a well or wells. The written contract was typically based on a standard form promulgated by the International Association of Drilling Contractors ("IADC"). Pursuant to the contracts, Latshaw would provide a drilling rig, personnel, and other associated equipment to drill a well subject to technical specifications provided by the operator. The operator decides whether to use water based mud or OBM.
OBM is more difficult to use than water based mud. It gets on equipment and personnel alike. It has an unpleasant odor. Because of the oil component, it is difficult to clean up. It is slipperier than water based mud and personnel must exercise greater care when using OBM. OBM causes skin irritation for some people, though not for everyone. OBM causes clothing, including boots, to deteriorate faster than water based mud. Working with OBM is unpleasant.
Pursuant to federal regulation, Latshaw required its employees on the rig to wear fire-resistant clothing ("FRC"). When an employee was hired by Latshaw, Latshaw issued the employee three pairs of FR coveralls, an FR rain suit, and an FR winter parka, all at company expense. The employee was responsible for providing whatever he[3] wore under the coveralls (which varied depending on temperature), together with work gloves and work boots (collectively, "Personal Clothing"). Latshaw also required its drilling employees to wear gloves and boots when on the job. When the original issued FRC wore out, the employee was responsible for providing replacement FRC. Likewise, the employee was responsible for replacing his Personal Clothing whenever it wore out.
During the pertinent period, Latshaw had two "points" programs that helped offset the employees' out-of-pocket costs of replacing clothing. First, under the FRC points program, every Latshaw employee working on a rig received fifty (50) points per month. The employee could use those accumulated FRC points to acquire replacement FRC from Latshaw. The FRC
*590 points could not be used to acquire Personal Clothing. Second, Latshaw had a safety point program during part of the applicable period. Employees earned safety points if certain safety metrics were met in a specified period. Safety points could be redeemed for a variety of products, including televisions, work boots, and work gloves.
Latshaw quit awarding new safety points at the beginning of 2015 (already-awarded safety points could still be redeemed, but no new points were awarded). Latshaw made no compensating increase in any other form of compensation to account for the elimination of safety points.
Whenever a Latshaw rig used OBM during a shift, Latshaw would pay all its employees on that shift a sum ranging from $25-$35 per shift (the "OBM Pay"). Not all Latshaw employees had the same degree of exposure to OBM when it was used, but all employees received the same OBM Pay. OBM was not necessarily used for the entire duration of a shift. But the amount of OBM Pay was fixed, regardless of the duration of use of OBM during a shift. Latshaw did not include OBM Pay in determining an employee's regular rate of pay.
During the relevant time frame, it was common in the industry for other drilling contractors to pay their employees OBM Pay, in amounts comparable to that paid by Latshaw. There is no evidence in the record regarding whether any other drilling contractor that paid OBM Pay either included or did not include, in whole or in part, that OBM Pay in determining its employees' regular rate of pay.
OBM caused increased wear and tear on FRC and Personal Clothing. Consequently, Latshaw employees who worked with OBM had to replace their FRC and Personal Clothing more often. Latshaw made no effort at the time to estimate how much additional out-of-pocket expenses an employee would incur because of working with OBM. Likewise the record at trial did not establish any reasonable estimate of the amount of increases in out-of-pocket expenses a Latshaw employee would incur because of working with OBM.
Some Latshaw employees received enough points that they never had to pay their own out-of-pocket money to acquire FRC or Personal Clothing. Some Latshaw employees paid increased out-of-pocket costs for FRC and Personal Clothing in an amount that exceeded the OBM Pay they received.
OBM Pay compensated Latshaw employees both for the undesirability and difficulty of working with OBM, and for their increased out-of-pocket expenses associated with the greater wear and tear on FRC and Personal Clothing caused by OBM.[4] There is no basis in the record to support any rational allocation between those two factors.
B. Conclusions of Law
FLSA "requires the inclusion in the regular rate of such extra premiums as ... premiums paid for hazardous, arduous or dirty work." 29 C.F.R. § 778.207(b). Premiums paid for hazardous, arduous or dirty work are commonly called "shift differentials."
Amounts paid by employers to reimburse employees for expenses incurred on the employer's behalf need not be included in the employee's regular rate of pay if the amount of the reimbursement reasonably approximates the expenses incurred.
*591 29 C.F.R. § 778.217(a). "The employer bears the burden of demonstrating that certain payments should not be included in determining its employees' regular rate." Johnson v. Big Lots Stores, Inc. , 604 F.Supp.2d 903, 927 (E.D. La. 2009) (citing Idaho Sheet Metal Works, Inc. v. Wirtz , 383 U.S. 190, 209, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966) ).
Latshaw had the burden of proving what amount, if any, of the OBM Pay was a reasonable approximation of the increased out-of-pocket expenses Latshaw employees incurred as a result of working with OBM. Latshaw failed to carry its burden of proving a reasonable approximation of the increased out-of-pocket expenses Latshaw employees incurred as a result of working with OBM. There is no rational basis on this record for the Court to allocate OBM Pay between a premium paid for hazardous, arduous or dirty work and a reasonable approximation of increased out-of-pocket expenses incurred as a result of working with OBM. The Court thus holds that all of the OBM Pay was a premium for hazardous, arduous or dirty work.
OBM Pay was a shift differential. OBM Pay should have been included in Latshaw's employees' regular rate of pay. Latshaw did not include OBM Pay in determining its employees' regular rate of pay. Plaintiffs are entitled to damages for Latshaw's failure to include OBM Pay in their regular rate of pay.
III. BONUS PAY
A. Findings of Fact
Certain of Latshaw's operators paid performance bonuses if certain performance criteria were met, primarily if a well was safely completed ahead of schedule, i.e., completion bonuses. Not all operators paid completion bonuses, and those that did pay bonuses did not pay them on every well. The IADC-derived drilling contracts did not obligate operators to pay a bonus. It was up to the operator to decide whether and how much of a bonus to pay. It appears that in some cases the possibility and criteria for the bonus were communicated to the drilling crew before the fact, though it appears that practice was not uniform.
If an operator decided to pay a bonus, it would communicate that to Latshaw. Latshaw would then pay the bonus to the crew and invoice the operator for the bonus plus a markup. The operator would then pay Latshaw on the invoice in the normal course of business. Latshaw was not contractually obligated to pay the bonus to the crew. In theory, Latshaw could have simply retained the extra revenue. In practice, though, there was no such discretion. Every time an operator chose to pay a bonus, Latshaw passed the bonus on to its crew as instructed by the operator.
The initial discretion of whether and how much of a bonus to pay was with the operator. If the operator chose to pay a bonus, Latshaw invariably passed that on to its crew. Latshaw did not have sole discretion to decide whether or how much of a bonus to pay.
Latshaw did not include completion bonuses in determining its crew's regular rate of pay.
B. Conclusions of Law
Bonus pay may be excluded from the regular rate of pay if "both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly ...." 29 U.S.C. § 207(e)(3)(a). Latshaw did not have the sole discretion to determine whether to *592 pay a bonus or the amount of the bonus. The completion bonuses should have been included in determining Latshaw's crews' regular rate of pay. Plaintiffs are entitled to damages for Latshaw's failure to include completion bonuses in their regular rate of pay.
IV. WILLFULNESS
A. Findings of Fact
From 2013 through 2016, Latshaw's Human Resources Director was Amanda Reid. Latshaw relied on Reid's advice regarding what remuneration to include or exclude in determining employees' regular rate of pay. Reid obtained a "professional human resources" ("PHR") certification in 2009. In order to obtain PHR certification, Reid was required to demonstrate proficiency in the applicable wage and hour laws and regulations. In order to retain her PHR certification, Reid participated in sixty hours of continuing education every three years. Reid was adequately trained in wage and hour legal issues. It was reasonable for Latshaw to rely and act on Reid's advice regarding wage and hour issues.
Before this lawsuit was filed, no person ever suggested to Latshaw that there was any issue regarding inclusion of OBM Pay or completion bonuses in the regular rate of pay. Reid reasonably believed that she was including all required compensation in the regular rate of pay calculation. Latshaw reasonably believed that it was including all required compensation in the regular rate of pay calculation. Latshaw intended to comply with all applicable wage and hour laws and regulations. Latshaw exercised reasonable care to comply with all applicable wage and hour laws and regulations. Reid, and therefore Latshaw, did not know that OBM Pay and completion bonuses should be included in the regular rate of pay.
B. Conclusions of Law
Latshaw did not know that excluding OBM Pay from the regular rate of pay violated FLSA. Latshaw did not know that excluding completion bonuses violated FLSA. The questions of whether OBM Pay or completion bonuses should be included in regular rate of pay raise complex legal and factual issues. Latshaw made reasonable efforts to comply with FLSA. Latshaw did not recklessly disregard its obligationss under FLSA. Latshaw's failure to include OBM Pay and completion bonuses in regular rate of pay was not willful.
CONCLUSION
All findings of fact above that are more properly considered as conclusions of law are adopted by the Court as such, and vice versa. The Court will, by separate order, establish a schedule for determination of the remaining issues in the case.

Both sides submitted proposed findings of fact and conclusions of law which were very well done and quite helpful to the Court.

The Court has previously bifurcated liability from damages, so these findings and conclusions deal only with the liability issues.

All of the plaintiffs are male.

See Plaintiffs' Exhibit 2 at 3 ("Mud per diem payments to employees are solely as remuneration for extraordinary wear on an employee's person, clothes, and property.") (Latshaw's responses to plaintiff's first set of interrogatories).