Peter J. **BRENNAN**, Secretary of Labor, United States Department of Labor, Plaintiff-Appellee,

v.

**SOUTHERN PRODUCTIONS, INC.,** Defendant-Appellant.

No. 74–1897.

United States Court of Appeals, Sixth Circuit.

April 15, 1975.

---

742

William Lamar Newport, Gullett, Steele, Sanford, Robinson & Merritt, Val Sanford, Nashville, Tenn., for defendant-appellant.

Marvin Tincher, Regional Atty., Dept. of Labor, Nashville, Tenn., Donald S. Shire, John K. Light, U. S. Dept. of Labor, Carin Ann Clauss, Jacob I. Karro, William J. Kilberg, Washington, D. C., for plaintiff-appellee.

Before WEICK and LIVELY, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

WEICK, Circuit Judge.

The Secretary of Labor brought an action in the District Court to enjoin Southern Productions, Inc., a Tennessee corporation, from violating the minimum wage, overtime, and record-keeping provisions of the Fair Labor Standards Act, as amended, and from withholding wages due certain employees of Southern Productions under the Act.

The case was heard by the District Court without a jury. The District Court adopted findings of fact and conclusions of law and entered an injunction granting the relief sought by the Secretary. Southern Productions appealed. We affirm.

Southern Productions operated an establishment in Louisville, Kentucky for approximately eight weeks during the summer of 1972. The sole issues in this case are whether the said operations of Southern Productions come within either the exemption created by § 13(a)(2) of the Act, as amended, 29 U.S.C. § 213(a)(2), applying to certain retail or service establishments, or the exemption created by 13(a)(3) of the Act, as amended, 29 U.S.C. § 213(a)(3), with respect to certain amusement or recreational establishments.[1]

The parties stipulated that more than 50% of the establishment's annual dollar volume of sales was made within Kentucky; that the establishment's annual dollar volume of sales was less than $250,000; and that none of the establishment's sales were for resale. The parties further stipulated that the establishment did not operate for more than seven months in any calendar year, and that its average receipts for any six months of such year were not more than 33⅓%

---

1. In 1972 the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201 et seq.), provided in relevant part:

    Sec. 13(a). The provisions of sections 6 and 7 shall not apply with respect to—

    . . . . .

    (2) any employee employed by any retail or service establishment . . . if more than 50 per centum of such establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, and such establishment is not in an enterprise described in section 3(s) or such establishment has an annual dollar volume of sales which is less than $250,000 (exclusive of excise taxes at the retail level which are separately stated). A "retail or service establishment" shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; or

    (3) any employee employed by an establishment which is an amusement or recreational establishment, if (A) it does not operate for more than seven months in any calendar year, or (B) during the preceding calendar year, its average receipts for any six months of such year were not more than 33⅓ per centum of its average receipts for the other six months of such year; . . . .

of its average receipts for the other six months of the year.

Southern Productions agreed that if § 13(a)(2) or (3) of the Act did not apply to the employees of its Louisville, Kentucky establishment, then it owed those employees $7,500, and the injunction asked by the Secretary should issue.

Southern Productions produces country music shows in various cities and states. Mr. John Bodin, president and principal shareholder of Southern Productions, testified that he arranges tours for the shows that Southern Productions produces and promotes. He testified:

> Generally at least three or four months ahead of a tour, I will make a decision with some of my other staff participating as to what particular cities we would like to play. Let's say we might have an area through one or two states of fifteen to twenty cities and we will determine which cities we would like to play in. Then we will— or I will contact the booking agency such as Atlas Artists which participated in this contract with their talent, and find out if certain specific artists are available for those dates which fall within the budget that we have predetermined that we will spend on each date that we are going to play.

> Then we will send out the contracting agent, once we have secured in advance the talent that we know we will have, and he goes in and starts contacting these various organizations in these various cities and explains to them who the talent will be coming in and what the basic concept is of our contract that we are trying to sell to them and consummate this.

(A. 69–70)

On April 24, 1972 Southern Productions' contracting agent negotiated a contract with the Jefferson County Policeman's Association of Louisville, Kentucky.[2] The contract provided that Southern Productions would produce two performances of its Kenny Price Show in Louisville, Kentucky, on August 5, 1972. Southern Productions was allowed to use the Jefferson County Policeman's Association's good will and name in promoting the show, and the profits were to be divided equally between the parties. Southern Productions guaranteed to hold the Policeman's Association, its officers and members, free from any liability or losses whatsoever in connection with the show.

In early June, 1972 a promotional coordinator employed by Southern Productions was sent to Louisville. He rented a storefront office and had several telephones installed, in the name of the Policeman's Association. A sign in the window identified the office as the "Jefferson County Policeman's Association Show Headquarters." Eventually eighteen telephones, all in the name of the Policeman's Association, were installed for use in promoting ticket sales.

The show headquarters employed telephone workers, ticket deliverers, and other office personnel. Many of the workers were paid less than the minimum wage and overtime provisions of the Fair Labor Standards Act required for workers covered by the Act. These workers were employees of Southern Productions, for the purposes of this case.

The telephone workers were assigned pages of the telephone directory for their calls to be made. In accordance with information on cards which the promotional coordinator gave to each telephone worker, the telephone workers told people whom they called that the proceeds of the show were to benefit the Policeman's Association.

Basically they called businesses during the day and residences during the evening. Mr. Bodin, president of Southern Productions, testified that generally about fifty per cent of such ticket sales

---

**2.** On April 24, 1972 the contracting agent also rented Louisville's Memorial Auditorium for the evening of the performances, in the name of the Jefferson County Policeman's Association.

were made to businesses. Almost all of the ticket sales were made in advance, through the show headquarters.

The shows were performed on August 5, 1972 at Louisville's Memorial Auditorium which has a seating capacity of approximately 1765. Neither performance played to a full house, although advance ticket sales had been many times the capacity of the auditorium.[3]

Mr. Bodin testified that in the case of such benefit programs experience had shown that only one in every seven tickets sold would be used, and advance ticket sales were made in accordance with this experience. About 85% of the tickets sold were not used.

Most of the shows produced by Southern Productions are sponsored by organizations such as the Jefferson County Policeman's Association. Although each individual establishment, such as the establishment created in the instant case to promote ticket sales for the Jefferson County Policeman's Association Show, exists only for approximately eight weeks, the total operations of all of Southern Productions' establishments are on a year-round basis.

■ It is settled that exemptions from the Fair Labor Standards Act "are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960); Fletcher v. Grinnell Bros., 150 F.2d 337, 340 (6th Cir. 1945). The employer has the burden of proving that it is within the terms and spirit of the exemption which it claims. Mitchell v. Kentucky

Fin. Co., 359 U.S. 290, 291, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959).

■ Whether employees are within an exemption from the provisions of the Act is primarily a question of fact. The District Court's findings of fact cannot be set aside unless they are clearly erroneous. Hodgson v. Klages Coal & Ice Co., 435 F.2d 377, 382 (6th Cir. 1970).

■ Although the rulings, interpretations and opinions of the agency are not binding on the Courts, they do constitute "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). Southern Productions has not challenged the rulings and interpretations with respect to the exemptions; it argues that under the statute and the rulings it is entitled to the exemptions for employees of its Louisville establishment.

I

§ 13(a)(2) of the Act.

■ The first step in determining whether the "retail or service establishment" exemption applies, is to ascertain whether the concept of retail selling of goods or services exists with respect to the establishment in question. The establishment must be part of a business or industry to which the "retail concept" applies. Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 202, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966); 29 C.F.R. § 779.-316.[4]

Southern Productions claims that the business of its Louisville establishment was analogous to the business of a thea-

---

3. Advance ticket sales were $46,003. The average ticket sold for $3. A family ticket was $6; an adult ticket was $3, advance sale of children's tickets $1, and other sales of children's tickets $2. Ticket sales at the box office amounted to only $161.

4. Although the exemption created by § 13(a)(2) is for employees of a "retail or service establishment," not all service establish-

ments can qualify. For the purpose of this exemption "service" means "retail service." Mitchell v. Kentucky Fin. Co., 359 U.S. 290, 295, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959); Roland Elec. Co. v. Walling, 326 U.S. 657, 675, 66 S.Ct. 413, 90 L.Ed. 383 (1946). Automobile repair shops, barber shops, and shoe repair shops are examples of retail service establishments. 29 C.F.R. § 779.320.

ter, which is listed in 29 C.F.R. § 779.320 as an establishment to which the retail concept may apply. We disagree.

Southern Productions regarded its contract with the Jefferson County Policeman's Association as its basic sale. Under this contract the Policeman's Association assumed no risk of loss. Basically, Southern Productions sold to the Policeman's Association a fund-raising opportunity in exchange for half of any profits and for permission to use the Policeman's Association's good will and name in promoting ticket sales.

The evidence indicates that the establishment was primarily engaged in the solicitation of contributions to the Policeman's Association. Prospective purchasers were told that the proceeds of the show were to benefit the Policeman's Association. The show headquarters sold approximately seven times the seating capacity of Memorial Auditorium. Most tickets were neither sold nor purchased for admission to the show, but as contributions to the Policeman's Association.

Mr. Charles Jennings, promotional coordinator for Southern Productions for this show, testified that with respect to sponsored shows, many people purchase tickets without intending to use them. They purchase tickets only in order to help the organization which is sponsoring the show.

We assume, in the absence of evidence to the contrary, that the price of the tickets was their fair market value. Purchasers who did not use their tickets did not thereby make a tax deductible contribution to the Policeman's Association. Rev. Ruling 67–246. However, this does not mean that such purchasers did not intend to make a contribution to the Policeman's Association. Also, it does not mean that tickets were not sold by the establishment for their contribution value to the Policeman's Association. As before stated, prospective purchasers were told that the proceeds of the show would benefit the Policeman's Association; sales efforts relied heavily on the good name of the Policeman's Association; and advance sales were approximately seven times the capacity of the auditorium in the expectation that only one in seven tickets sold would actually be used.

The show headquarters was primarily engaged in soliciting contributions for the benefit of the Policeman's Association, and such activity is unquestionably outside the retail concept. Viewed in that manner, the establishment did not sell goods or services "frequently acquired for family or personal use." Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 203, 86 S.Ct. 737, 745, 15 L.Ed.2d 694 (1966); 29 C.F.R. § 779.318. Neither did it serve the everyday needs of the community nor dispose of small quantities of goods or services at the end of the stream of distribution. 29 C.F.R. § 779.318. It could not have the aforesaid three characteristics of a retail establishment, because it was not primarily engaged in selling goods or services to the people whom its employees called by telephone.

■ The second step in ascertaining whether the retail or service establishment exemption applies, is reached only if it is first determined that the retail concept applies to the establishment's business. Idaho Sheet Metal Works, Inc. v. Wirtz, *supra*, 383 U.S. at 202, 86 S.Ct. 737. The employer claiming the exemption must prove that 75% of the establishment's annual dollar volume of sales "is recognized as retail sales or services in the particular industry." Sec. 13(a)(2), as amended, 29 U.S.C. § 213(a)(2).

Southern Productions called two witnesses to establish that the retail concept applied to the business of the establishment, and that the required percentage of sales was recognized as retail in the industry. Both witnesses were very well acquainted with the country music segment of the entertainment industry. The witnesses testified that the establishment in question had the characteristics which the regulations identified as belonging to the typical retail establishment. However, neither had thought in terms of the retail concept prior to being

contacted by Southern Productions' attorney.[5]

■ Even if the establishment in question did have the characteristics identified by the regulations as belonging to a typical retail establishment, it would not necessarily be a retail establishment within the meaning of the Act. For example, an establishment in the business of making personal loans cannot qualify for the exemption although, arguably, it has the characteristics of a typical retail establishment listed in 29 C.F.R. §§ 779.318 and 779.319. Mitchell v. Kentucky Fin. Co., 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959).

Southern Productions' Louisville establishment bore little resemblance to traditional retail establishments, both in its method of operation and in the fact that it was never intended to exist longer than approximately eight weeks. It stands far outside the purpose of the § 13(a)(2) exemption.

In A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 497, 65 S.Ct. 807, 89 L.Ed. 1095 (1945), the Court said:

> From the standpoint of its legislative ancestry, Section 13(a)(2) is the offspring of a manifest desire to exclude from the scope of the Act "business in the several States that is of a purely local nature." Sen.Rep. 884, 75th Cong., 1st Sess., p. 5. Congress was interested in exempting those regularly engaged in local retailing activities and those employed by small local retail establishments, epitomized by the corner grocery, the drug store and the department store. It felt that retail concerns of this nature do not sufficiently influence the stream of interstate commerce to warrant imposing the wage and hour requirements on them. *Ibid.* p. 5.

[Footnote omitted.]

Moreover, the testimony of Southern Productions' own witnesses was to the effect that the sales by the establishment in question, even if the establishment is regarded as engaged in providing entertainment to the community, are not recognized in the industry as retail sales. The Supreme Court has held that industry usage of the word "retail" is not decisive. Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 200, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966). However, industry usage is an important factor. 29 C.F.R. § 779.324.

■ The District Court's factual findings that the retail concept did not apply to the establishment's business and that its sales were not recognized in the industry as retail sales, are supported by substantial evidence and are not clearly erroneous.[6]

## II
### § 13(a)(3) of the Act.

■ Since the principal activity of the show establishment in Louisville was

5. Mr. Irwin Kirby, editor in chief of *Amusement Business*, and guides and directories published by *Amusement Business*, testified with respect to the retail concept:

> This is not my normal lexicon, and I'm used to functioning in other ways.

He also testified that prior to this suit he had no need to think in terms of retail or wholesale.

Mr. H. K. Wilson, vice-president of Atlas Artists of Goodlettsville, a booking agency, testified that he had never thought in terms of the retail concept before he was given a copy of the regulations for purposes of preparing his testimony.

Moreover, the witnesses assumed that the establishment was primarily engaged in providing entertainment and recreation to the community. We have concluded that the establishment was primarily engaged in soliciting contributions to the Policeman's Association, based primarily upon the number of tickets which the establishment expected would not be used, and which actually were not used.

6. Southern Productions has argued that the District Court confused the "enterprise", Southern Productions, with the establishment, the show headquarters, in determining that the exemptions claimed did not apply. "Establishment," of course, is the term used by the Act in providing the exemptions and the determinations required by that Act are made with reference to the establishment. The District Court's conclusions of law indicate clearly that it differentiated between the enterprise and the establishment.

not, as we have already discussed, providing the community with amusement or entertainment, the amusement or recreational establishment exemption cannot apply with respect to its employees. Brennan v. Texas City Dike & Marina, Inc., 492 F.2d 1115, 1119 (5th Cir. 1974), cert. denied, 419 U.S. 896, 95 S.Ct. 175, 42 L.Ed.2d 140. *Cf.* Brennan v. Six Flags Over Georgia, Ltd., 474 F.2d 18, 19 (5th Cir. 1973), cert. denied, 414 U.S. 827, 94 S.Ct. 47, 38 L.Ed.2d 61; Hodgson v. Colonnades, Inc., 472 F.2d 42, 46–47 (5th Cir. 1973).

It is therefore unnecessary for us to decide whether, as the Secretary contends, the amusement and recreational establishment exemption contains a tacit "seasonality" requirement in addition to the exemption's express requirements.

Affirmed.