William A. LANG, Plaintiff,

v.

MIDWEST ADVANCED COMPUTER SERVICES, INC., a Michigan Corporation, Defendant.

No. 80–70238.

United States District Court, E. D. Michigan, S. D.

Jan. 29, 1981.

Stalburg, Bean & Laritz, Detroit, Mich., for plaintiff.

Parvin Lee, Jr., Booth, Patterson, Lee, Karlstrom & Steckling, Pontiac, Mich., for defendant.

## OPINION AND ORDER

ANNA DIGGES TAYLOR, District Judge.

Plaintiff herein was employed by the defendant from June 15, 1977, through February 16, 1979. He filed his complaint on January 18, 1980, alleging defendant's failure to pay overtime wages. The jurisdiction of this court is proper, under Section 16(b) of the Fair Labor Standards Act of 1938, as amended [29 U.S.C. § 201 et seq.]. The parties have stipulated that defendant is an employer subject to the statute, inasmuch as it is undisputedly engaged in interstate commerce.

Trial was held to the court on December 4, 5 and 9, 1980. Defendant's motion to dismiss, made at the close of plaintiff's case pursuant to Federal Rules of Civil Procedure 41(b) was denied by the court. The following are the court's findings of fact and conclusions of law, on the whole record.

Plaintiff was hired by Mr. Joseph Varitek, defendant's Vice-President for its Savings and Loan Division, on June 15, 1977. No formal contract of employment was entered into. Plaintiff possessed a Bachelor's Degree in Business Administration from the University of Michigan, where he majored in finance. Defendant was engaged in the business of providing computer time and computer services to customers including a number of small savings and loans, credit unions and at least one bank, in Michigan and Ohio. Defendant engaged in interstate commerce. The services which it provided consisted of computer programs for maintenance of ledger systems in financial institutions, for immediate recordation and retrieval of all transactions and balances. Defendant leased computer hardware from manufacturers, and in turn leased it to customers, with programs appropriate to the customers' operations.

Plaintiff's routine duty as a Customer Service Representative in defendant's Saving and Loan Division was to act as service liaison to defendant's customers. Data processing employees of the various savings and loan institutions would call plaintiff

with any difficulties in hard and software services, for instruction as to input of specific transactions on computer terminals, or about the pricing of the packages of services offered by defendant.

In the summer of 1977, the plaintiff's job duties were drastically altered, however, when the defendant embarked upon an ambitious project to improve its services to its clients. Defendant acquired new hardware and software for its future expanded operations—a new Burroughs B–4800 computer, and a software package purchased from "Sunshine State Systems," a Tampa, Florida firm. The decision making process on selection and purchase of those systems lasted throughout the summer and fall of that year. During the winter of 1977–78, several of defendant's employees were sent to Florida to consult with and receive training from Sunshine State Systems' personnel in the operation of the new software system. Plaintiff was included in the group of employees who made this instructional trip to Florida, in February of 1978.

The employees who had received the benefit of this training, were thereafter designated as members of a new "conversion team." Those persons were to adapt the newly-purchased soft and hardware systems combined, to fit the specific needs of defendant's clients, and then to implement systems in a series of pilot institutions. The team consisted of (1) members of a newly-created "Systems Department", in charge of hardware operations; (2) several employees of the Programming Department, whose duty was to modify the new software to accommodate as much as possible the old system that defendant's clients had learned; (3) employees of the Telecommunications Department, who were to direct the use of the new computer terminals; and (4) the plaintiff, the sole customer service representative on the team. The specific function of plaintiff on the team is at the heart of this lawsuit, the defendant having claimed that plaintiff was an "exempt" employee, as defined by the Act, its regulations, and the case law.

The decision to form the team was made at the highest management level, and was followed by the decision that, upon completion of the basic instruction in Florida, members of the team would be physically relocated from defendant's offices in the City of Warren, to separate offices in the City of Southfield (both suburbs of Detroit), Michigan. Such isolation was thought to be necessary to insulate the team members from the on-going operation of the old system.

The evidence reveals that one result of this insulation was the practical disruption among team members of the company's organizational structure and line of command. Beginning in February, 1978, with the move to the Southfield office, plaintiff had virtually no contact, day-to-day, with the main office of defendant, and hence, little contact with his supervisor, Mr. Bill Craig. Instead, Mr. John Plesz, who was in charge of the conversion team, functioned, as a practical matter, as plaintiff's supervisor during the relevant period. (February to October of 1978). It was during those months that plaintiff claims to have worked a total of 449.5 overtime hours without compensation at an overtime rate.

The only direct and credible testimony given as to the nature of plaintiff's job duties during this period was plaintiff's. Defendant called one witness, Mr. Joseph Varitek, a shareholder in the company, a former Vice-President, who was located in the Warren office up until the early fall of 1978, and who was never plaintiff's direct supervisor (either in practical reality, or in the company's formal organizational chart). To the very slight extent that Mr. Varitek's testimony contradicts plaintiff's, it is not deemed to be credible, both in light of his continued financial interest in the company, and his admission of lack of personal knowledge on the subject of plaintiff's work and hours. His testimony was punctuated by the qualifications of "I guess," "I imagine," and conjecture of what plaintiff's role "should have" or "would have" been.

Plaintiff's accurate, detailed and obviously first-hand testimony was forthright,

credible to this court, and directly oriented to the events which occurred from February through October of 1978, among the "team" which was sent to Southfield.

Mr. Lang's duties during this period commenced with an assignment to compare the "record lay-out" of defendant's old ledger system and the new one. The system purchased from Sunshine State Systems had some slight differences in format from that which defendant's clients had used, e. g., which line the customer's name would be printed on and the number of spaces allotted for account numbers or other identifying information. Completion of this task consumed only about the first month and a half of the time spent on the team.

Two other tasks constituted the remainder of plaintiff's assignment to the conversion project. Plaintiff "de-bugged" or tested the programs developed for the new system, and wrote or "documented" his results into a first draft of a teller's manual.

The testing was accomplished by plaintiff punching keys on a computer terminal as directed by his functional team-assigned supervisors, Mr. Craig or Mr. Jim Szeles. He would essentially, enter mock transactions at the terminal room. If the operation resulted in correctly reflecting the transaction on the customer's account, then the transaction was re-run once by Mr. Craig and verified; plaintiff was instructed to note the correct sequence of keys in his manual (the documentation phase) and then the next test was conducted. But if an error appeared in the "dump", then plaintiff would call this to the attention of the computer programmers, who determined the exact nature of the error, and corrected the program accordingly. The correction usually required modification of the computer program, a skill which plaintiff did not possess, having taken only two computer courses while in college. If the error was a very obvious and simple one, then plaintiff could sometimes describe it to the programmers to their satisfaction. Often, however, he was unable to analyze an error, and was required to do no more than present the problem to the programmers

for their study. After modification of the computer program, if needed, plaintiff would be instructed to re-test that same transaction, and the process would begin again.

The second task, documentation, was designed to create a teller's manual for the use of defendant's clients. Plaintiff performed this task simultaneously with the testing, as described above. From March until June, he was the only person engaged in this phase of the conversion effort. In June, as time became urgent, John Surgas was assigned to take over the documentation while plaintiff devoted himself to entering transactions into the terminals, as directed. The documentation written by either plaintiff or Surgas was reviewed by Mr. Craig and Mr. Szeles, who made major and minor changes in the format which plaintiff had created, then distributed it to other members of the conversion team and to those of defendant's clients who would enter the pilot program.

Plaintiff was then sent to the Glandorf, Ohio, facilities of the first pilot savings and loan customer to come "on-line" under the new computer system. This pilot institution's conversion did not proceed smoothly, and plaintiff's experience in documenting and testing transactions under the new system became helpful to the Glandorf client. The time spent in Ohio constituted his only client contact during the relevant time frame, and as with plaintiff's other 1978 tasks, was significantly different from his usual role as a Customer Service Representative, because he was removed from normal independence. Plaintiff's job in Glandorf was merely to act as a communicator between the customers' terminal and the home office, where Mr. Szeles and the programmers stood ready to make necessary corrections in the program, and telephoned directions to plaintiff to enter transactions in various manners. As tellers would key in either mock or real transactions, and not receive the correct results, plaintiff would call the home office, and describe the failure as accurately as he could. Plaintiff did not and could not make recommendations of

possible solutions, nor actively participate in changing the programs. He merely tested new approaches to entering transactions.

During all of this time, plaintiff performed the work he was assigned by his functional supervisors, pursuant to their day-to-day instructions. At times, plaintiff took instructions from the computer programmers, who were not his line supervisors. Plaintiff reported to Mr. Szeles and Mr. Plesz, and when feasible, to Mr. Craig, and himself supervised no one. He had neither the skill nor the authority to effect changes in the design of computer programs, either on his own initiative or at the behest of others. His work did not entail the exercise of independent judgment or discretion, nor the direction of other employees. During the period of time in question, plaintiff was diverted from his Customer Service Representative tasks to this much more closely supervised position.

The proof of overtime hours worked is furnished by plaintiff in two forms, and one of these must be relied upon by the court, inasmuch as defendant failed to keep any records of plaintiff's hours, as it was required to do under the Act. Plaintiff submits a journal in which he recorded all overtime hours worked throughout the February to October, 1978 months, both weekday hours beyond eight, and weekend hours. The second source of proof is the expense account sheets which were submitted by plaintiff to defendant and approved by defendants during the months of June, 1978 through the end of that year. All employees of the company who used these forms were instructed to insert the date and amount of their food, lodging and transportation expenses (for which they were reimbursed at regular intervals) and to indicate weekend overtime hours worked.

Although plaintiff was never paid or otherwise compensated for the weekend overtime worked, he was nevertheless instructed to record it on the expense sheets, for the purpose of calculating meal reimbursement. Plaintiff was also told by his superiors to keep a separate record of his own of all overtime hours, which was the journal or

pocket calendar which he has placed in evidence.

In late February, during plaintiff's assignment to the conversion team, defendant allocated raises to many employees, and simultaneously circulated a letter stating the dire financial plight of the company. Plaintiff became displeased with his situation at this time, particularly because even after his raise he was still being paid less than some of defendant's more recently hired employees. Discussions ensued between plaintiff and Mr. Varitek, as well as Mr. Plesz. The former promised another raise (which was given) and both responded to plaintiff's complaint of the numerous overtime hours he was working. The delicate situation of the company was reiterated to him and promises were made that plaintiff would be compensated for his overtime work, once the new system was operative and successful. In addition, both gentlemen advised him to keep track of all overtime hours worked. This plaintiff did, in the aforementioned journal, but was never compensated, in any form. When this prospect became clear in January of 1979, plaintiff ceased working any overtime at all.

The overtime was worked by plaintiff at the general request, and with the knowledge of all of defendant's superior officers. Plaintiff testified that he was often told that he would be needed to come in early, to stay late, or to work on a weekend, as necessary to run mock transactions into terminals and complete some new program documentation or testing. Hours worked were determined by the after-hours or daytime availability of computer-time, of the programmers, and of the superior members of the program-development team. Much of the overtime was made necessary by the fact that the conversion was not going smoothly, the initial deadlines had passed, and early completion of the conversion was urgently sought, to ease defendant's financial hard times. Although plaintiff's hours were not so strictly defined as by factory time clocks he *was expected* to work overtime hours whenever transactions were to

be tested. Defendant presented no evidence to rebut plaintiff's claim of working those overtime hours, as recorded in the journal. Mr. Varitek's most definite statement was only that he had "no way of knowing" whether plaintiff did work overtime. Given this evidence, the court concludes that plaintiff did work overtime as claimed, at the request of the defendant's agents.

The court credits plaintiff's journal as an accurate recapitulation of the overtime hours which he worked. Plaintiff was instructed to keep this journal by the defendant's agents, and made his notations in it every three to four days, according to his testimony. Plaintiff's testimony was credible and his demeanor convincing, which leads the court to adopt the data in the journal as the most reliable evidence of the hours worked. The journal reflects 449.5 hours overtime, which (taking into account plaintiff's salary rates throughout the relevant months, which rates were stipulated to by defendant), should have been compensated in the amount of $5,425.03.

The court finds, on the basis of applicable federal regulations and definitions, that plaintiff was a statutorily non-exempt employee, entitled to payment at no less than one and one-half time his regular rate for all hours worked in excess of forty hours per week.

■ There is no dispute but that the defendant is an employer covered by the Fair Labor Standards Act, and plaintiff's testimony that he worked overtime hours is not refuted. Defendant, moreover, has failed to meet its burden of proof on its contention that plaintiff is exempt from the Act under 29 U.S.C. § 213(a)(1). That this burden is on the defendant is clear, *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959), *Hodgson v. Klages Coal and Ice Co.*, 435 F.2d 377 (6th Cir. 1970), cert. den. 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137 (1971), *Brennan v. Southern Productions, Inc.*, 513 F.2d 740 (6th Cir. 1975).

Furthermore, such an exemption would have had to be proven by plain and unmistakable evidence, something which defendant has utterly failed to do. The statutory exemptions are to be narrowly construed and only those persons who clearly fit into the limited exemptions are to be exempted from the Act. *Wirtz v. Lunsford*, 404 F.2d 693 (6th Cir. 1968), *Hodgson v. Klages Coal and Ice, supra.*

The statutory exemption upon which defendant relies is contained in 29 U.S.C. § 213(a)(1):

The provisions of sections 206 and 207 of this title shall not apply with respect to—(1) any employee employed in a bona fide executive, administrative, or professional capacity, or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary ...) ...

Defendant focuses its claim upon the "administrative" aspect of this exemption. Undoubtedly, plaintiff was not an executive of the company, and was not employed as a professional, as those terms are defined by the Secretary, and defendant makes no such claims.

In determining that plaintiff is not exempt as an "administrative" employee, the court has reviewed the facts of his job duties, his relationship to defendant's other employees, and the regulations found at 29 CFR § 541.2 et seq, and in particular, by § 541.207(c)(7). These regulations serve as guidance to the court in its findings, as they are promulgated by the agency assigned to enforce and interpret the Act, *Brennan v. Southern Productions, supra, Hamblen v. Ware*, 526 F.2d 476 (6th Cir. 1975). As such, they are entitled to great weight, and have been held to carry the full force of law, *Pezzillo v. General Telephone and Electronics Information Systems Inc.*, 572 F.2d 1189 (6th Cir. 1978) [affirming Judge Morton's opinion below, at 414 F.Supp. 1257, M.D. Tennessee, 1976].

■ The regulations state that an "administrative" employee is one:

(a) Whose primary duty consists of .... The performance of office or nonmanual work directly related to management pol-

icies or general business operations of his employer or his employer's customers . . . *and*

(b) Who customarily and regularly exercise discretion and independent judgment; *and*

(c) (1) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined in the regulations of this subpart), or

(2) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, or

(3) Who executes under only general supervision special assignments and tasks; *and*

(d) Who does not devote more than 20 percent . . . of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (c) of this section; *and*

(e) . . . Who is compensated for his services on a salary or fee basis at a rate of not less than $155 per week. . . (29 CFR § 541.2, emphasis added.)

The court notes that the five qualifications are joined by the conjunctive "and"; hence all qualifications must be met before the employee is to be defined as exempt, *Hodgson v. Barge, Waggoner and Sumner*, 377 F.Supp. 842 (M.D.Tenn.1972), aff'd without opinion, 477 F.2d 598 (6th Cir. 1973). The substantial question of this litigation is whether plaintiff meets requirement "b", of customarily and regularly exercising discretion and independent judgment. This court finds that he does not. The discretion and judgment phrase is defined and delimited in great detail in 29 CFR § 541.207, which states:

(a) In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term . . . moreover, implies that the person has the authority or power to make an indepen-dent choice, free from immediate or direct supervision and with respect to matters of significance . . .

(b) The term must be applied in the light of all the facts involved in the particular employment situation in which the question arises. It has been most frequently misunderstood and misapplied by employers and employees in cases involving the following: (1) Confusion between the exercise of discretion and independent judgment, and the use of skill in applying techniques, procedures, or specific standards; and (misapplication of the term to employees making decisions relating to matters of little consequence.)

(c) Distinguished from skills and procedures:

(1) Perhaps the most frequent cause of misapplication of the term "discretion and independent judgment" is the failure to distinguish it from the use of skill in various aspects. An employee who merely applies his knowledge in following prescribed procedures or determining which procedures to follow . . . is not exercising discretion and independent judgment within the meaning of § 541.2 . . .

(7) In the data processing field a systems analyst is exercising discretion and independent judgment when he develops methods to process, for example, accounting, inventory, sales and other business information by using electronic computers. He also exercises discretion when he determines the exact nature of the data processing problem, and structures the problem in a logical manner so that a system to solve the problem and obtain the desired results can be developed . . . Examples of work not requiring the level of discretion and judgment contemplated by the regulations are highly technical and mechanical operations such as the preparation of a flow chart or diagram showing the order in which the computer must perform each operation, the preparation of instructions to the console operator who runs the computer or the actual running of the computer by the programmer, and the debugging of the program . . .

■ The decision by the District Court in *Pezzillo v. GTE, supra,* and adopted by the Sixth Circuit, is most helpful in the resolution of this case. There, the court held that the defendant's computer programmers were not exempt as "administrative" employees. The court found that the employees in question exercised a job skill, and not discretion and independent judgment, when they tested and debugged a newly-purchased computer system (following their translation of the old program into the computer language of the new system). The case is completely apposite to the case at bar, and the experience of this plaintiff: his participation in a conversion team effort after defendant's purchase of new equipment, his comparison of old format to new format, his testing or debugging, and the documentation of positive results into the draft teller manual, is substantially identical. Clearly, plaintiff's work required skills and some familiarity with financial procedures, but did *not* require the exercise of "discretion and independent judgment." All his testing activities and subsequent recordations were at the explicit, case-by-case direction of superiors. Therefore, plaintiff was not an exempt employee and was entitled to overtime wages, pursuant to the Fair Labor Standards Act.

■ In the joint pre-trial presentation of issues to the court, the parties suggested that one legal issue to be resolved was defendant's claim that lack of notice constituted a complete defense to this action. The issue was framed in terms of whether plaintiff ever claimed overtime wages from defendant while he was still working there, and before he brought suit. Defendant failed to pursue this issue in its trial brief, or during trial, and plaintiff asserts that there is no such defense, citing *George Lawley & Son Corp., v. South,* 140 F.2d 439 (1st Cir. 1944), cert. den. 322 U.S. 746, 64 S.Ct. 1156, 88 L.Ed. 1578 (1944), and *De-Pasquale v. Williams-Bauer Corp.,* 151 F.2d 578 (2nd Cir. 1945), cert. den. 328 U.S. 836, 66 S.Ct. 1007, 90 L.Ed. 1612 (1946). The court finds that this is not an appropriate defense to the suit, primarily because of plaintiff's credible testimony that he met with two supervisors to complain of his unwillingness to continue to work long overtime hours without compensation. Plaintiff's letter of resignation, admitted into evidence, also specifically requests compensation for overtime worked.

■ The court further finds that plaintiff is entitled to liquidated damages in an amount equal to the overtime payment due, pursuant to § 16 of the Act. Defendants hired the plaintiff perceiving (as the court did) his intelligence, responsibility, and earnest desire to achieve. Defendant's sole witness, according to his own testimony, knew (though he knew little else about the nature of plaintiff's duties or working hours) that plaintiff was a person who was very "willing" to work long hours. Defendant capitalized on this willingness, and obtained the benefit of plaintiff's complete commitment to the conversion project, which demanded long overtime hours.

Defendant, throughout the trial, called attention to the "importance" and innovativeness of the conversion project, in an attempt to equate the vital nature of the team's effort (to the company) to the alleged exempt status of plaintiff. This misinterpretation of the Act and its regulations does not convince the court of the existence of the exemption, but only highlights the callousness of defendant's refusal to pay overtime. This young employee, working on a project which was pivotal to the company's future, was very simply exploited by the defendant, and is entitled to liquidated damages. The district court's opinion in *Pezzillo* notes the frequency with which defendants in the data processing industry claim exemptions of their personnel from the protection of the Fair Labor Standards Act, unjustifiably. In the case of the unequivocal regulations on this subject, this attempt must be seen as one taken in bad faith.

Plaintiff is also entitled to costs including reasonable attorney's fees, and on motion with supporting data (within twenty (20) days of the entry of this opinion and order) they shall be awarded to plaintiff, together

with judgment in the amount of $5,425.21, liquidated damages in the amount of $5,425.21, and costs.

Therefore, judgment accordingly shall be entered for the plaintiff.