**Edward F. FARLEY and Thomas J. Finn, Plaintiffs,**

v.

**METRO NORTH COMMUTER RAILROAD, Defendant.**

No. 86 Civ. 2503 (DNE).

United States District Court, S.D. New York.

July 26, 1988.

Cahill, Goetsch & DiPersia, New York City, Charles C. Goetsch, of counsel, for plaintiffs.

Proskauer Rose Goetz & Mendelsohn, New York City, Howard L. Ganz, of counsel, for defendant.

## OPINION AND ORDER

EDELSTEIN, District Judge:

Plaintiffs and defendant cross move for summary judgment. Summary judgment is granted to defendant.

### I. *Background*

Edward Farley, as the General Chairman of the United Transportation Union ("UTU") at Metro–North, and Thomas Finn, an engineer and representative of the Brotherhood of Locomotive Engineers ("BLE"), bring this action on behalf of themselves and approximately 1000 Metro–North employees represented by those unions. This action against defendant Metro–North Commuter Railroad seeks to recover unpaid overtime compensation allegedly owed to plaintiffs pursuant to § 7 of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, and to recover liquidated damages pursuant to § 16(b) of the FLSA, 29 U.S.C. § 216(b).[1]

---

1. The practical effect of the claim is to give plaintiffs working a "swing time job" pay for time and one half for each hour exceeding 40 hours a week. Complaint ¶ 13. A "swing time job" is one where the employee's scheduled workday includes a non-working interval (the "release period") between one and four hours. Under both the UTU and BLE contracts, em-

ployees are paid at one half the hourly rate for the release period. The present UTU contract requires that half the release time be counted toward a forty hour work week; the present BLE contract does not contain any provision allowing for release time to be counted toward the forty hour threshold.

The defendant, Metro–North, is a common carrier by rail continuing the business of its predecessor railroads in transporting passengers throughout the New York City area and Connecticut along the Harlem, Hudson, and New Haven Lines. These lines have been regulated under the Interstate Commerce Act ("ICA") since 1888. *See* 49 U.S.C. §§ 1–27. Railroads subject to the provisions of the ICA are exempted from the employee wage and hour requirements set forth in the FLSA. *See* 29 U.S. C. § 213(b)(2) (FLSA § 13(b)(2)). In November 1982, however, Metro–North received an exemption from ICA regulations pursuant to 49 U.S.C. § 10505 (enacted in its present form in 1980). Metro–North sought the exemption primarily to avoid the necessity of complying with the detailed accounting and record keeping required by the Interstate Commerce Commission ("ICC"). Plaintiffs claim that upon receiving the ICA exemption, Metro North no longer fell within the purview of § 13(b)(2)[2] of the FLSA and thus became obligated to comply with the maximum hour requirements of that Act. The defendant claims that despite the administrative exemption granted by the ICC, Metro–North remains "subject to the provisions" of the ICA and therefore remains exempted from the FLSA pursuant to § 13(b)(2).

Plaintiffs and Defendant have stipulated the relevant facts[3] and cross moved for summary judgment on the issue of whether § 13(b)(2) applies to the defendant. For the reasons stated below, the court finds that Metro–North still falls within the scope of § 13(b)(2). Accordingly, the defendant's motion for summary judgment is granted and the plaintiffs' motion for summary judgment and claim for liquidated damages are denied.

## II. *Discussion*

### A. Statutory Construction

All employees of employers engaged in interstate commerce are subject to the maximum hour provisions of the FLSA, 29 U.S.C. § 207(a)(1), unless their employer falls within one of the exemptions set forth in 29 U.S.C. § 213. The section that applies to railroads, § 13(b)(2), exempts "any employee of an employer engaged in the operation of a common carrier by rail and subject to the provisions of part I of the Interstate Commerce Act." Part I of the old ICA has been subsumed under Subtitle IV of the revised ICA. The question presented in the instant cross motions is whether the ICC exemption from Subtitle IV of the ICA received by Metro–North in November 1982 renders the defendant no longer "subject to the provisions" of the ICA.

The plaintiffs contend that "subject to the provisions" of the ICA means subject to *all* its provisions. The defendant contends that "subject to the provisions" of the ICA means subject to *some* of its provisions. As the language of the statute does not unambiguously support either the plaintiffs' or the defendant's position, the court has to look into the purposes of the FLSA § 13(b)(2) exemption and the ICA § 10505 exemption.

Although the plaintiffs' construction of § 13(b)(2) has an initial appeal, that argument loses its allure upon closer scrutiny of the purpose of that exemption. In *Idaho Sheet Metal Works v. Wirtz*, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1965), Justice Harlan noted in his examination of a FLSA § 13 exemption: "[t]o construe the present language of the exemption demands a knowledge of its origins." *Id.* at 196, 86 S.Ct. at 742. If an analysis of the exemption's origins reveal that the language of section 13(b)(2) conflicts with its purpose, it is a well established cannon of statutory construction that the court should go beyond the literal language and construe the exemption consistently with its purpose.

---

**2.** Section 13(b)(2), 29 U.S.C. 213(b)(2), provides that § 7 of the FLSA, 29 U.S.C. 207, shall not apply to "any employee of an employer engaged in the operation of a common carrier by rail and subject to the provisions of part I of the Interstate Commerce Act."

**3.** After an independent review, the court certifies that there are no material issues of fact to be litigated in the instant case. Accordingly, the instant case, which is apparently a case of first impression, is subject to adjudication through motions for summary judgment.

*Bob Jones University v. United States*, 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983). Chief Justice Taney's discussion of statutory construction in *Browne v. Duchesne*, 60 U.S. (19 How.) 183, 15 L.Ed. 595 (1857), is particularly appropriate here,

> The general words used in the clause ..., taken by themselves, and literally construed, without regard to the object in view, would seem to sanction the claim of the plaintiff. But this mode of expounding a statute has never been adopted by any enlightened tribunal—because it is evident that in many cases it would defeat the object which the Legislature intended to accomplish. And it is well settled that, in interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute ... and the objects and policy of the law.

*Id.* 60 U.S. (19 How.) at 184.

The need to examine a statute's purpose is particularly strong when the situation facing the court was unforseen by the legislature at the time when the statute was passed. N. Singer, *Sands, Sutherland Statutes and Statutory Construction*, § 45.09 (4th ed. 1984). This is precisely the situation presented in the instant case.

### B. FLSA

As President Franklin D. Roosevelt stated in his May 24, 1937 message to Congress, the FLSA was designed to "extend the frontiers of social progress [by] ... insuring to all ... able bodied men and women a fair day's pay for a fair day's work." At a time when there was no federal legislation protecting industrial and agricultural workers from exploitation, the FLSA established a minimum wage for employees engaged in interstate commerce. Furthermore, in § 7 of the FLSA, Congress provided for a maximum work week of 40 hours and guaranteed time and one half for all work done in excess of 40 hours. The two-fold purpose of the FLSA's overtime requirements are to place financial pressure on employers to hire more workers and to compensate employees for the burden of working overtime. *Donovan v. Brown*, 666 F.2d 148, 152 (5th Cir.1982). In drafting the FLSA, however, Congress recognized that certain employees did not need the protection of the Act. Accordingly, section 13 of the FLSA exempts certain employers from the requirements of § 7, including in § 13(b)(2) "carriers by rail subject to the provisions" of the ICA. The exemptions are designed to keep the FLSA from interfering in industries already subject to federal regulations:

> [I]t was the policy of the committee, in cases where regulation of hours and wages are given to other government agencies, to write the bill in such a way as not to conflict with such regulation ... It was taken with reference to railroad workers insofar as they were governed by the Hours of Service Act ... [I]t is my belief that it would certainly be unwise to have the hours of service regulated by two governmental agencies. I am further of the opinion that the Interstate Commerce Commission, since it has the power and has exercised it, should be the agency to be entrusted with this duty.

81 Cong.Rec. 7875 (daily ed. July 30, 1937) (Statement of Sen. Black).

Although there is no federal regulation specifically regulating the wages of railroad employees, Congress has addressed railroad labor matters in a series of acts since 1888. Included among these acts is the Hours of Service Act which regulates railroad employees hours.[4] This series of acts, as well as the development of labor unions, protected the rights and interests of railroad employees. Accordingly, Congress saw no need to further protect these employees by including them within the purview of the FLSA.

---

4. Those federal statutes regulating railroads include: The Arbitration Act (1888), the Erdman Act (1898)—revised in the Newland Act (1913), the Transportation Act of 1920, the Railway Labor Act (1926), the Railroad Retirement Act of 1937, the Railroad Unemployment Insurance Act of 1938, the Carriers Taxing Act of 1937—recodified in 1954 as the Railroad Retirement Act.

Plaintiffs, nevertheless, contend that Congress did not mean to extend the FLSA exemption to all interstate railroads but only to those "subject to the provisions" of the ICA. As the defendant obtained a 49 U.S.C. § 10505 exemption from ICA provisions, the plaintiffs argue that the defendant cannot also be subject to such provisions as specified by the language of § 13(b)(2). Further, the plaintiffs also point out that § 13(b)(2) exemptions should be strictly construed against the party asserting to be covered by them. *Phillips, Co. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945).

It is apparent, however, that the plaintiffs' reading of § 13(b)(2) is contrary to the intent of Congress. In 1937, when § 13(b)(2) was drafted, all interstate railroads were subject to the ICA. At that time, the legislature could not have foreseen the great increase in state regulation, the heightened competition facing railroads, and the subsequent need for deregulation eventually codified in 49 U.S.C. § 10505 in 1978 and amended by the Staggers Rail Act in 1980. The language of 13(b)(2) was not meant to subject deregulated railroads to other statutory provisions, but to encompass the scope of the ICC's jurisdiction without entering into the complications of defining that scope. Moreover, the plaintiffs' reading would frustrate the exemptions purpose of avoiding conflict with other federal statutes regulating hours and wages.

## C. ICA

The plaintiff also claims that application of the FLSA to railroads exempted under 49 U.S.C. § 10505 is consistent with the language and purpose of such exemptions. In fact, the plaintiffs' interpretation of the § 10505 exemption would undermine its purpose. The ICA was passed in 1888 with the purpose of regulating railroads to ensure development of transportation systems, encourage sound economic conditions, foster cooperation among the states, and encourage fair wages and working conditions. In 1980 the ICA was amended by the Staggers Rail Act which provides in 49 U.S.C. § 10505 that the ICC can exempt parties from certain ICA requirements. Such exemptions are to be granted if the requirements are not necessary to carry out the transportation policy of § 10101 and the transaction or service exempted is of limited scope or the application of the requirement is not needed to protect shippers from the abuse of market power. The purpose of this exemption "is to provide through ... freedom from unnecessary regulation, the opportunity for railroads to obtain adequate earnings to restore, maintain and improve facilities while achieving the financial stability of the national rail system." H.R.Conf.Rep. No. 96–1430, 96th Cong.2d Sess. 80, *reprinted in*, 1980 U.S. Code Cong. & Admin.News 3978, 4110, 4111.

An exemption under § 10505 does not leave a carrier entirely free from the provisions of the ICA. Exempted carriers remain subject to ICC review in order to ensure that the exempted carriers comply with ICA policy. Under § 10505(d), the ICC can revoke an exemption when it finds that application of a provision of the subtitle "is necessary to carry out the transportation policy of section 10101(a)." The legislative history of the Staggers Rail Act notes that "[t]he scope of regulatory authority over railroads by the commission continues to be all inclusive." H.R.Rep. No. 96–1035, 96th Cong., 2d Sess. 86, *reprinted in* 1980 U.S.Code Cong. & Admin. News 3978, 4030. This idea was bolstered in *Consolidated Rail Corporation—Declaratory Order–Exemption*, 1 I.C.C.Rep. 895 (Feb. 27, 1986) (order 40045), in which the ICC decided that an exemption issued pursuant to § 10505 does not extinguish the ICC's jurisdiction:

> The revocation power is one of the central features of section 10505. It ensures the usefulness of the exemption process as a means of testing and determining the appropriate bounds of regulation in a changing transportation environment without the need for continual congressional attention. Congress envisioned exemptions as an experimental process.

*Id.* at 899.

Given the experimental nature of the exemption scheme and the revocability of ex-

272

emptions it is difficult to believe Congress intended the exemptions to place carriers under a different set of federal regulations. The purpose of the exemption is to free railroads from regulations, not subject them to different regulations that did not previously apply. In *Consolidated,* the Commission states a "substitution or reintroduction of regulation by another forum (whether it be a State regulatory body or another federal body such as a court) would defeat the fundamental purpose of the exemption process." *Id.* at 899. As well as being subject to ICC review and possible revocation of an exemption at any time, exempted carriers are subject to §§ 10505(e) and (g) from which the Commission may not exempt a carrier.[5]

Metro–North's § 10505 exemption from provisions of the ICA does not exclude them from all ICA provisions. Furthermore, the ICC can partially or completely revoke Metro–North's exemption at any time it finds it necessary to carry out railway policy, see § 10505(d). Thus, Metro–North remains "subject to the provisions" of the ICA according to the language and purpose of FLSA § 13(b)(2) and is therefore exempt from the requirements of FLSA § 7. Accordingly, plaintiffs' claims, as they are made pursuant to the FLSA, are unavailing.

### Conclusion

Plaintiffs' motion for summary judgment is denied. Defendant's motion for summary judgment is granted.

SO ORDERED.

---

**5.** Section 10505(e) and (g) state respectively as follows:

(e) No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11707 of this title [49 U.S.C. § 11707]. Nothing in this subsection or section 11707 of this title shall prevent rail carriers from offering alternative terms nor give the Commission the authority to require any specific level of rates or services based upon the provisions of section 11707 of this title.

(g) The Commission may not exercise its authority under this section (1) to authorize intermodal ownership that is otherwise prohibited by this title, or (2) to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle.